FILED

2023 Jul-26  AM 11:07
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| LAUREN REYNOLDS and LAURIE PENN, individually and on behalf of all others similarly situated, | : : : : : | |
| Plaintiffs, | : : | Case No.: 5:22-cv-00503-RDP |
| vs. | : : | |
| PROGRESSIVE DIRECT INSURANCE COMPANY, an Ohio corporation, and PROGRESSIVE SPECIALTY INSURANCE COMPANY, an Ohio Corporation, | : : : : : | |
| Defendants. | : : | |

## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ................................................................................................. 1

II.   RELEVANT FACTUAL BACKGROUND ........................................................ 4

    A.   Progressive's Form Policy Terms and Uniform Procedures............................ 4

    B.   Progressive's Total-Loss Valuation Methodology ......................................... 4

    C.   Imposing a PSA is Inconsistent with Market Realities and Appraisal Standards............ 5

    D.   To Calculate the PSA, Progressive Ignores and Deletes Market Data that Disprove its Market Theory. .............................................................................. 7

III.  ARGUMENT ..................................................................................................... 10

    A.   The Class Is Ascertainable.......................................................................... 10

    B.   Common Issues Predominate....................................................................... 11

        1.   Courts consistently find that common issues predominate in cases where insureds present common proof that a discrete element of the ACV calculation constitutes a breach of contract.................................................. 12

        2.   The elements of Plaintiffs' breach of contract claim are subject to common proof that predominate over individual questions. ............................... 13

        3.   Plaintiffs' damages model fits their theory of liability, and any individual issues of damages cannot predominate over common issues of liability. .................... 16

    C.   The Remaining Rule 23(a) Prerequisites Are Met........................................ 21

        1.   The Class is numerous such that joinder is impracticable. ...................... 21

        2.   Plaintiffs are typical of, and will adequately represent, the Class. ......... 21

    D.   Class Treatment Is Superior........................................................................ 23

IV.   CONCLUSION.................................................................................................. 24

i

## TABLE OF AUTHORITIES

**Cases**

*Angell v. GEICO Advantage Ins. Co.*,
  573 F. Supp. 3d 1151 (S.D. Tex. 2021) ................................................................. 12

*Armstead v. Pingree*,
  629 F. Supp. 273 (M.D. Fla. 1986) ......................................................................... 21

*Armstrong Bus. Servs., Inc. v. AmSouth Bank*,
  817 So. 2d 665 (Ala. 2001) ..................................................................................... 15

*Brown v. Electrolux Home Prods., Inc.*,
  817 F.3d 1225 (11th Cir. 2016) ............................................................................... 12

*Bussey v. Macon Cnty. Greyhound Park, Inc.*,
  562 F. App'x 782 (11th Cir. 2014) .......................................................................... 11

*Cherry v. Dometic Corp.*,
  986 F.3d 1296 (11th Cir. 2021) ............................................................................... 11

*Clippinger v. State Farm Mut. Auto. Ins. Co.*,
  No. 2:20-cv-2482-TLP-cgc, 2022 WL 17592417 (W.D. Tenn. Sept. 26, 2022) ..... 14

*Cox v. Cmty. Loans of Am. Inc.*,
  625 Fed. Appx. 453 (11th Cir. 2015) ...................................................................... 10

*Drummond, et al. v. Progressive Specialty Ins. Co., et al.*,
  5:21-cv-04479-EGS (E.D. Pa.) ................................................................................. 4

*Freeman v. Progressive Direct Ins. Co.*,
  1:21-cv-03798-DCC (D.S.C.) .................................................................................... 4

*Giles v. Ireland*,
  742 F.2d 1366 (11th Cir. 1984) ............................................................................... 10

*Hicks v. State Farm Fire & Cas. Co.*,
  965 F.3d 452 (6th Cir. 2020) ................................................................. 13, 16, 19, 20

*In re Delta/AirTran Baggage Fee Antitrust Litig.*,
  317 F.R.D. 675 (N.D. Ga. 2016) ............................................................................. 11

*In re Domestic Air Transp. Antitrust Litig.*,
  137 F.R.D. 677 (N.D. Ga. 1991) ............................................................................. 22

*In re MDC Holdings Sec. Litig.*,
  754 F. Supp. 785 (S.D. Cal. 1990) .......................................................................... 22

*In re Target Corp. Customer Data Sec. Breach Litig.*,
  309 F.R.D. 482 (D. Minn. 2015) ............................................................................. 21

*In re Visa Check/MasterMoney Antitrust Litig.*,

280 F.3d 124 (2d Cir. 2001)...................................................................................... 21

*Klay v. Humana, Inc.*,
    382 F.3d 1241 (11th Cir. 2004) ..................................................................... 12, 23

*Kornberg v. Carnival Cruise Lines, Inc.*,
    741 F.2d 1332 (11th Cir. 1984) ............................................................................ 21

*Krakauer v. Dish Network, L.L.C.*,
    925 F.3d 643 (4th Cir. 2019) ............................................................................... 12

*Lara v. First Nat'l Ins. Co. of Am.*,
    25 F.4th 1134 (9th Cir. 2022) .............................................................................. 20

*Lewis v. Gov't Empls. Ins. Co.*,
    2022 WL 819611 (D.N.J. March 18, 2022) ................................................ 13, 18, 20

*Little v. T-Mobile USA, Inc.*,
    691 F.3d 1302 (11th Cir. 2012) ........................................................................... 10

*Mitchell v. State Farm*,
    954 F.3d 700 (5th Cir. 2020) ...................................................................... 13, 19, 20

*Ohio State Troopers Ass'n v. Point Blank Enters.*,
    347 F. Supp. 3d 1207 (S.D. Fla. 2018) .................................................................. 10

*Paris v. Progressive Am. Ins. Co.*,
    No. 19-21761-CIV, 2020 U.S. Dist. LEXIS 212127 (S.D. Fla. Nov. 13, 2020) ..................... 13

*Powers v. Government Employees Ins. Co.*,
    192 F.R.D. 313 (S.D. Fla. 1998).......................................................................... 22

*Roth v. GEICO Gen. Ins. Co.*,
    No. 16-62942-CIV, 2018 U.S. Dist. LEXIS. 226658 (S.D. Fla. May 3, 2018)...................... 16

*Sampson v. United Services Auto. Ass'n*,
    Case No. 6:19-cv-896, 2022 WL 1415652 (W.D. La. May 3, 2022) ...................... 13, 18, 20

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
    130 S. Ct. 1431 (2010)...................................................................................... 10

*Shields v. State Farm Mut. Auto. Ins. Co.*,
    Case No. 6:19-cv-1359, 2022 WL 37347 (W.D. La. Jan. 3, 2022) ............................ 12, 18, 20

*Simer v. Rios*,
    661 F.2d 655 (7th Cir. 1981) .............................................................................. 11

*Slade v. Progressive Sec. Ins. Co.*,
    2014 U.S. Dist. LEXIS 154713 (W.D. La. Oct. 30, 2014) ......................................... 12, 18, 20

*Smith v. Ga. Energy United States*, 259 F.R.D. 684 (S.D. Ga. 2009)............................. 23

*Smith v. S. Farm Bureau Cas. Ins. Co.*,
    18 F.4th 976 (8th Cir. 2021) .............................................................................. 14, 21

*Sos v. State Farm Mut. Auto. Ins. Co.*,
   No: 6:17-cv-890-Orl-40LRH, 2019 U.S. Dist. LEXIS 139680 (M.D. Fla. May 2, 2019) ....... 13

*Stuart v. State Farm Fire & Cas. Co.*,
   910 F.3d 371 (8th Cir. 2018) ................................................................. 13, 16, 19, 20

*Valley Drug Co. v. Geneva Pharms., Inc.*,
   350 F.3d 1181 (11th Cir. 2003) ...................................................................... 22

*Vega v. T-Mobile USA, Inc.*,
   564 F.3d 1256 (11th Cir. 2009) ...................................................................... 10

*Volino v. Progressive Cas. Ins. Co.*,
   2023 U.S. Dist. LEXIS 44666 (S.D.N.Y. Mar. 16, 2023) ............................... passim

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ..................................................................................... 11

**Rules**

Fed. R. Civ. P. 23 ............................................................................................. 10
Fed. R. Civ. P. 23(a) ........................................................................................ 10
Fed. R. Civ. P. 23(a)(1) .................................................................................... 21
Fed. R. Civ. P. 23(a)(2) .................................................................................... 11
Fed. R. Civ. P. 23(a)(3) .................................................................................... 21
Fed. R. Civ. P. 23(a)(4) ............................................................................... 22, 23
Fed. R. Civ. P. 23(b) ........................................................................................ 10
Fed. R. Civ. P. 23(b)(3) .............................................................................. 12, 23
Fed. R. Civ. P. 23(g) ........................................................................................ 23
Fed. R. Civ. P. 23(g)(1) .................................................................................... 23

**Other Authorities**

Newberg on Class Actions § 12:2 ..................................................................... 17

## I.    INTRODUCTION

This case is one of many materially identical cases against Progressive currently pending in courts around the country. Recently, the first ruling on class certification for these materially identical cases was issued by the Southern District of New York, which granted class certification of identical claims as those pled in this case. *See Volino v. Progressive Cas. Ins. Co.,* 2023 U.S. Dist. LEXIS 44666 (S.D.N.Y. Mar. 16, 2023). This Court should follow the *Volino* court's well-reasoned analysis and grant class certification of Plaintiff's claims here.

Under basic appraisal standards, calculating the actual cash value ("ACV") of a vehicle using the comparable (or "comp") methodology is done by taking the average price of comparable vehicles, adjusted for verified differences between each respective comparable vehicle and the insured vehicle in mileage, equipment, and condition. Adjustments to the price of comparable vehicles cannot be based on unverified assumptions, to say nothing of purposely discarding and ignoring any data that undermines such assumptions. But that is precisely what Progressive does in determining the ACV of its insureds' vehicles by applying a "projected sale adjustment" to the list price of comparable vehicles, purportedly to reflect that consumers uniformly negotiate down the list price of used autos in cash transactions. They do not.

In the modern used auto market, dealers price vehicles to market and list vehicles for sale on the Internet at that market price. Data on millions of used car transactions confirm that vehicles typically sell for their list price. This case exists because Progressive ignored how the modern used auto market operates, ignored the empirical data of vehicle transactions, and ignored appraisal standards for calculating ACV.

It is undisputed that when insureds suffer a total loss to their vehicles, Progressive's form insurance policy ("Policy") requires payment of ACV, less any deductible. And it is undisputed

that in calculating ACV, Progressive must consider the market value of that vehicle type. Progressive determines ACV using the comparable or "comp" method but makes a critical departure from that industry-standard methodology: Before making adjustments to comparable vehicles based on verified differences in equipment, condition, and mileage, Progressive reduces the list prices of comparable vehicles by applying a "Projected Sold Adjustment" ("PSA") █████, on average, that it (falsely) represents is the amount consumers can negotiate off the advertised price in a cash transaction. This is invalid because it is not based on verified information—to the contrary, it is based on deliberately manipulated data and is based on a verifiably false assumption about the used car market.

Auto industry experts explain that Progressive's assumption—that dealerships overprice vehicles and consumers typically negotiate down from that advertised cash price—reflects a *long*-outdated understanding of the used car market. Given the ubiquity of Internet comparison shopping and the development of sophisticated pricing tools, car dealerships now aggressively price vehicles to market—meaning the list price must reflect the appraised cash market value—and advertise those prices online. After all, consumers who can compare advertised prices from their own home have no reason to visit a dealership advertising an inflated price. This is confirmed by millions upon millions of used car transactional data points, including Progressive's *own data*.

So how can Progressive possibly justify slashing the list prices of used vehicles used to determine ACV by (on average) more than █████? The answer is shocking: Progressive and its vendors calculated the PSA by supposedly comparing the advertised price of used vehicles to the amount they ultimately sold for, yet they excluded *every transaction where a vehicle sold for the Internet list price or a penny or more higher*. In other words, it simply discarded all data that undermined its foregone decision to reduce its insureds' ACV payments. When the 1-to-1

transactions (transactions where a vehicle sold for its list price) are considered, rather than discarded—in other words, curing this single error in the data analysis—Progressive's data show the median vehicle sells for ██ of its advertised price. Exhibit 1 is a graphical portrayal of the sold-to-list ratio ("S/L Ratio") of millions of vehicles, which shows that vehicles typically sell for list price.

Because Progressive and its vendors deleted from the data all transactions where a vehicle sold at or above its listed price, Plaintiff purchased a transparent data set of listed and sold vehicle prices. Plaintiff's expert matched millions of list-price and sold-price records by VIN number. As shown in Ex. 1, this unadulterated dataset demonstrates vehicles typically sell for their advertised price, regardless of whether one measures typical as the mean, median, or mode of the transactions. This is significant: the empirical data confirm list prices equate to market value—just as the industry experts opine. All the evidence, then, is in accord. Plaintiff's experts' testimony that ACV is appropriately calculated by taking the average list price of comparable vehicles, adjusted for verified and documented variances in equipment, mileage, and condition—reflected in the Mitchell appraisal reports—is buttressed by overwhelming empirical evidence and used car industry expert testimony confirming that list price is the appropriate starting point.

In short, the PSA is capricious, arbitrary, and outright false. Class treatment will ensure that, after Plaintiff proves her case, insureds will receive the benefits they are entitled to and paid premiums to receive the market value of their totaled vehicles. Once the PSA is excised from each Class member's detailed valuation report, the reports document a sound appraisal of ACV following the customary comp methodology. *See Volino*, 2023 U.S. Dist. LEXIS 44666, at *26 ("Progressive cannot dispute that applying every aspect of its valuation process other than the PSA leads to an accurate valuation[.]").

This case is eminently suitable for class treatment: Plaintiff's claims are based on (1) identical form contract language and (2) practices that applied uniformly across the Class. Plaintiff believes the PSA deduction was always improper, while Progressive believes it was always proper. Whether a jury agrees with Plaintiff or Progressive, resolution of that question will resolve virtually the entirety of Class members' claims in a single stroke. Thus, this Court should grant certification of the Classes defined in Ex. 13.

## II.    RELEVANT FACTUAL BACKGROUND

### A.  Progressive's Form Policy Terms and Uniform Procedures

Progressive uses form insurance policies with materially identical language. Ex. 2 ("Retton Dep.") at 26–29.[1] In Section IV, Progressive promised to pay for "loss" to covered autos. Ex. 3 (Policy) at 14. In the "Limit of Liability" subsection, Progressive limits its liability to the vehicle's ACV, *id.* at 18, and states that ACV will be based on the "market value, age, and condition of the vehicle at the time the loss occurs," *id*. at 19. Plaintiffs and Class members experienced what Progressive determined to be a total loss. Ex. 4 ("Silver Dep.") at 27, 30.[2] Consistent with its Policy terms, Progressive's uniform practice is to base total-loss payments on Mitchell's appraisal of the vehicle's ACV (albeit in an insufficient amount).

### B.  Progressive's Total-Loss Valuation Methodology

Progressive's methodology for valuing total-loss vehicles is to utilize a third-party vendor, Mitchell, to generate a vehicle valuation report. Retton Dep. at 37–38, 55–59. After an adjuster

---

[1] By agreement of the parties, the deposition of John Retton taken in *Drummond, et al. v. Progressive Specialty Ins. Co., et al*., 5:21-cv-04479-EGS (E.D. Pa.), and *Freeman v. Progressive Direct Ins. Co*., 1:21-cv-03798-DCC (D.S.C.), is being used in lieu of retaking that deposition.

[2] By agreement of the parties, the depositions taken in *Volino* of Michael Silver, Phillip Kroell, and Blaine Bogus are being used in this case in lieu of retaking those depositions.

inputs the information, the report is generated through the Total-Loss WorkCenter ("WCTL"). *Id.* at 37–38, 40–42; Ex. 5 ("Kroell Dep.") at 20. Progressive used WCTL reports throughout the Class Period as its default method of calculating ACV. Retton Dep. at 37–38, 41–42, 55–59.

First, Mitchell identifies the listed price of comparable vehicles. *Id.* at 37, 51, 59. Then, it applies a PSA deduction to these list prices, purportedly to "reflect consumer purchasing behavior (negotiating a different price than the list price)." *Id.* at 42–43, 75; *see also* Ex. 6 ("Plaintiffs' Report") at 9. In other words, Progressive's position is that car dealerships uniformly price vehicles above market and negotiate down to the actual market value; thus, according to Progressive, the list prices must be reduced by (on average) ███. The new "price"—reduced by the PSA—of each comparable vehicle is then adjusted based on observed and documented differences, if any, in mileage or equipment. Kroell Dep. at 142–143. The average of the adjusted prices constitutes the "base" market value. *Id.* at 144–45. From there, Mitchell adjusts the base value amount based on the insured vehicle itself—if the total-loss vehicle was in below- or above-average condition, for example—which establishes what Progressive represents is the "adjusted" market value. *Id.* at 145. Finally, any taxes, fees, and deductible are automatically calculated and applied, which becomes the ultimate claim payment amount. Retton Dep. at 74. Progressive maintains this data in its electronic claims file system. Ex. 7 ("Lacey Report") at 9–12.

### C. Imposing a PSA is Inconsistent with Market Realities and Appraisal Standards

Progressive's assertion that list prices of comparable vehicles are bloated and that consumers routinely negotiate advertised prices down is belied by market forces. Plaintiffs' industry expert explains this position is an outdated and false characterization of the market. Ex. 8 ("Felix Rep.") at 2–3. *Many* years before the Class period, it was perhaps a fair characterization of market forces. Without Internet advertising and sophisticated pricing tools, a vehicle's "sticker"

price was not really a factor—consumers went to the local dealership that could provide the desired vehicle type and buyers could not easily compare listed prices across numerous dealerships. *Id.* at 3. Now, not only can dealers identify the precise amount at which comparable vehicles are listed in the market, so too can consumers—and if the dealership prices above market, consumers will know it and will patronize competing dealerships who priced to market. *Id.* at 3–5.

This does not mean vehicles invariably sell for the precise listed price. Used car transactions are structured in numerous ways that cause a vehicle's sold price to be reported as less than (or more than) the advertised price but are unrelated to actual ***cash*** value. For example, a dealership might sell a vehicle for less than list price if, *inter alia*, (1) they are getting points on a loan; (2) there is a special discount (military, employee, friends/family); (3) a consumer is entitled to apply a "credit" earned through use of the service department; (4) the purchaser had an attractive trade-in that incentivized the dealership to sell at a below-market price so as to obtain the trade-in vehicle; or (5) the consumer found a previously-unidentified defect. *Id.* at 6–8. But these reasons "have nothing to do with the actual market price of a vehicle." *Id.* at 8.

Additionally, Plaintiffs' appraisal expert explains the "comp" methodology Progressive utilizes is a line-item method to arrive at the ACV of damaged property, pursuant to which appraisers take the list prices of comparable vehicles and make line-item adjustments for documented differences between the comparable vehicle and insured vehicle in mileage, equipment, and condition. Ex. 9 ("Merritt Rep.") at 2–4. Any adjustment must be based on observed, documented, and verified data. *Id.* Other than the PSA, Mitchell's method is consistent with this standard and documents a detailed, sound appraisal of each loss vehicle that Progressive presents to the insured as ACV. *Id.* at 7–9.

But Progressive deviated from proper appraisal standards in applying the PSA. *Id.* at 4–7.

6

Because the PSA is not based on observed, verified data, it is inconsistent with proper appraisal standards. *Id.* at 6–7. As Merritt explains, the proper method for identifying a vehicle's ACV is to take the average price of comparable vehicles, adjusted for documented differences in mileage, condition, and equipment. *Id.* at 2–4. As such, the market value of every Class member's vehicle is identified in the valuation reports. *Id.* at 7. Simply remove the PSA deductions, and the detailed valuation report identifies the vehicle's ACV. *See Volino*, 2023 U.S. Dist. LEXIS 44666, at *26.

### D. To Calculate the PSA, Progressive Ignores and Deletes Market Data that Disprove its Market Theory.

Notwithstanding these market realities and appraisal standards, Progressive imposes a PSA deduction that averages ███. Lacey Report at 13. This is based on a manipulation (and then misrepresentation) of the data.

Here's how it works: Mitchell hires Blaine Bogus and a three-person team (the "Bogus Team") at J.D. Power to calculate the PSA. Ex. 10 ("Bogus Dep.") at 17–18. Mitchell provides the Bogus Team with advertised price data gathered from Internet advertisements. *Id.* at 21. The Bogus Team compares that data to sales data from its "Power Information Network" ("PIN") of dealers. *Id.* at 21–22. The Bogus Team's data is a black box. Neither Progressive nor the Bogus Team has conducted any analysis to determine whether the PIN dealers are representative of the used vehicle market but, instead, "assum[e] it would be reflective of the general market." Bogus Dep. at 155:18–156:16. J.D. Power refuses to disclose any dealership from which it obtains such data and has designated it as "Highly Confidential—Outside Counsel's Eyes Only." Nevertheless, Progressive accepts the PSA without question as a basis for reducing its insureds' ACV payments.

The most shocking part of this scheme is that, in calculating the PSA, the Bogus Team simply excludes from the data all transactions where the sales price exceeds the list price and, until July 2021, excluded every transaction where the vehicle sold for list price. Bogus Dep at 57–60;

Lacey Report at 3–5. This bears repeating: the Bogus Team made the spurious assumption that transactions at or above list price are outliers, notwithstanding that it never conducted a single analysis to determine how often those purported "outliers" occur and, in fact, had no idea how many records were being excluded. Bogus Dep. at 57–58, 61–63. A simple analysis shows that transactions selling at list price constitute ███ *of the transactions* in the PIN data. Lacey Report at 4. Discarding and deleting data because of an undesirable (to Progressive) but relevant characteristic invalidates the data. *Id.* Correcting for the single deliberate error of omitting transactions at list price results in a negligible ██ variance between sold and list prices. *Id.* & Exhibit 8 thereto at 2.

And this does not even account for transactions where the sold price exceeded the list price by a penny or more, which the Bogus Team also discarded, keeping no record of how many transactions it excluded from the data. Bogus Dep. at 137; Lacey Report at 4–5. For a vehicle to sell for higher than its listed price is not an outlier or an oddity. Felix Rep. at 8–10. Mr. Martin identified that 23.47-29.93% of vehicles were reported to the DMV as sold for more than listed price. Ex. 11 (Martin Rep.) at ¶¶ 27, 29, 32, 34, 36, 39, 41, 43, 46, 48, 50, 53.

Moreover, the Bogus Team does not account for transactions involving a military/employee/family discount, purchase financing, or other reasons a sold price might be less than list price but for reasons unrelated to its *cash* market value. Bogus Dep. 73:22–75:5. Instead, after tossing transactions selling at list price or a penny more, the Bogus Team credulously accepts that *any difference* up to a staggering ██ between list and sold price is the product of negotiation in a cash transaction, despite never taking any effort to determine whether that is true. *Id.* at 74:20–75:5. Consider that one of the primary reasons a vehicle might sell for less than list price is that a dealership simply offered less than it otherwise would have on a vehicle trade-in—or it might be

incentivized to sell for a below market price because the purchaser has an attractive trade-in. Felix Rep. at 6–7. Not only are these instances unrelated to actual market value, they are irrelevant in the context of total-loss insureds, as they have no vehicle to trade in.[3] Also, instances where a dealership might chop a few hundred dollars off list price because the consumer is financing the purchase through the dealership—meaning it will more than make up the profit difference—are irrelevant because Progressive owes actual ***cash*** value, not actual financed value. And that some people may be entitled to a discount is irrelevant to the ***actual*** cash value.

Unfortunately, Progressive's vendors claim they no longer have the full transactional data and, thus, cannot calculate the actual difference (if any) between sold and list prices when considering all transactions. So, Plaintiff retained a statistician, Jeffrey Martin, to analyze a large set of transparent data reported by all dealers to state DMV offices. Mr. Martin identified a robust sample size of 1.4 million–2.4 million matches *per year*. Martin Rep. at ¶¶ 27, 34, 41, 48. The results confirm Mr. Felix's testimony: The median vehicle sale is for the advertised price, regardless of whether all transactions are considered or if outlier ranges are applied. *Id.* at ¶¶ 27, 29, 31, 34, 36, 39, 41, 43, 45, 48, 50, 53. The average vehicle sale is a negligible 99.5% (meaning sold prices were, on average, a mere 0.5% lower than listed prices) at most. *Id*. at ¶¶ 36, 39, 43, 45, 50, 53, 56, 59. These findings confirm that list price equates to market value and, thus, that the PSA deduction is invalid. These results are summarized in the figures and tables in Exhibit 1.

In short, instead of looking at the data honestly, Progressive and its vendors began with a foregone conclusion: "Consumers negotiate down the advertised cash price of a vehicle." They

---

[3] There are numerous other flaws in the Bogus Team's analysis, as set forth in Dr. Lacey's Report and the Appendix thereto. Critically, Dr. Lacey, for purposes of the Appendix, essentially adopted the Bogus Team's assumptions and demonstrated that, even accepting such flawed assumptions, the Bogus Team's analytical approach does not faithfully represent the data.

then manufactured "support" and thumbed the scale by ignoring and deleting all market data to the contrary. Once this lone invalid adjustment is removed, each Mitchell Report documents a good faith appraisal of each Class member's loss vehicle. Certifying this case for class treatment is proper under well-established law, *see, e.g.*, *Volino*, 2023 U.S. Dist. LEXIS 44666, at *37–40, and will ensure Class members receive the ACV to which they are entitled, and for which they paid premiums.

## III.    ARGUMENT

To certify a class, class members must be ascertainable, all Rule 23(a) requirements must be satisfied, and at least one Rule 23(b) subsection must be satisfied. *See, e.g.*, *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1265 (11th Cir. 2009). Courts analyze the merits of the pleadings to the extent necessary to determine whether Rule 23 is satisfied, *see, e.g.*, *Ohio State Troopers Ass'n v. Point Blank Enters.*, 347 F. Supp. 3d 1207, 1218 (S.D. Fla. 2018), but do not "engage in free-ranging merits inquiries at the certification stage." *Cox v. Cmty. Loans of Am. Inc.*, 625 Fed. Appx. 453, 455 (11th Cir. 2015). District courts have discretion in determining whether class treatment is appropriate. *See Giles v. Ireland*, 742 F.2d 1366, 1372 (11th Cir. 1984). But if a plaintiff shows that Rule 23 elements are met, the discretion disappears. *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 130 S. Ct. 1431, 1437 (2010) (Rule 23 "creates a categorical rule entitling a plaintiff" who satisfies the Rule's elements "to pursue his claim as a class action.").

### A.  The Class Is Ascertainable

A threshold requirement for certification is that the class must be ascertainable. *See Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012). The Eleventh Circuit recently explained administrative feasibility plays no part in the analysis and it established a simple standard: "[A] proposed class is ascertainable if it is adequately defined such that its membership

is capable of determination." *Cherry v. Dometic Corp.*, 986 F.3d 1296, 1304 (11th Cir. 2021). This does not mean "capable of *convenient* determination." *Id.* at 1303 (emphasis in original).

As detailed in Dr. Lacey's Report at 9–12, the parties and the Court can determine if someone is a Class member based on objective, identifiable criteria in the electronic claims data and documentation maintained by Progressive. Thus, even if "convenient determination" were the standard, it would be met. Every criterion for membership—insured by Progressive, date of loss, whether it was a covered total-loss claim, whether it was based on a Mitchell Report, and whether a PSA was applied—is objective, not subjective criteria such as state of mind. *Compare, e.g.*, *Bussey*, 562 F. App'x at 787 ("An identifiable class exists if its members can be ascertained by reference to objective criteria") *with Simer v. Rios*, 661 F.2d 655, 659 (7th Cir. 1981) (class members could not be identified absent the "Sisyphean task" of deciphering their state of mind).

As courts have explained (and under the former more stringent administrative feasibility standard), even where records from a defendant and third-party vendors would need to be cross-referenced with records only in class members' possession—such as receipts or credit statements—the ability to ascertain the class is met if such records are "objective," thereby allowing for reliable identification. *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 317 F.R.D. 675, 692 (N.D. Ga. 2016). Here, identification can be made based *solely* on Progressive's own records, and although it may require looking at individual Reports, this does not preclude certification. *Id.* at 693.

## B.  Common Issues Predominate

Under Rule 23(a)(2), there must be questions common to the class, meaning there is a question the answers to which "will resolve an issue that is central to the validity of [each claim] in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). In turn, the common

issue(s) must, per Rule 23(b)(3), predominate over individual questions, meaning that issues subject to generalized proof predominate over issues that require individualized proof. *See, e.g., Klay v. Humana, Inc.*, 382 F.3d 1241, 1254 (11th Cir. 2004). In conducting the analysis, courts should identify the elements of the claim(s) and "classify these issues as common questions or individual questions by predicting how" the elements will be proved. *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1234 (11th Cir. 2016). Importantly, "a class can meet this requirement even though other important matters will have to be tried separately." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 658 (4th Cir. 2019).

### 1. Courts consistently find that common issues predominate in cases where insureds present common proof that a discrete element of the ACV calculation constitutes a breach of contract.

It is worth noting at the outset that where insureds proffer common proof that a discrete portion or element of an ACV calculation is illegitimate and constitutes a breach of contract, courts consistently find that class treatment is appropriate—including, most notably, in the *Volino* case addressing claims identical to the claims here. *Volino*, 2023 U.S. Dist. LEXIS 44666, at *24 (where plaintiffs challenged a PSA reduction to the list price of comparable vehicles, the "critical common questions identified by Plaintiffs predominate over those individual inquiries"); *Slade v. Progressive Sec. Ins. Co.*, 2014 U.S. Dist. LEXIS 154713 (W.D. La. Oct. 30, 2014) (common issues predominated where insureds challenged base value calculation of totaled vehicles) *rev'd on other grounds* 856 F.3d 408 (5th Cir. 2017); *Shields v. State Farm Mut. Auto. Ins. Co.*, Case No. 6:19-cv-1359, 2022 WL 37347, at *7–8 (W.D. La. Jan. 3, 2022) (same); *Angell v. GEICO Advantage Ins. Co.*, 573 F. Supp. 3d 1151, 1160 (S.D. Tex. 2021) (common issues predominated where plaintiffs claimed insurer underpaid ACV by not including sales tax and title fees); *Sampson v. United Services Auto. Ass'n*, Case No. 6:19-cv-896, 2022 WL 1415652, at *8 (W.D. La. May 3,

2022) (same); *Hicks v. State Farm Fire & Cas. Co.*, 965 F.3d 452, 459 (6th Cir. 2020) (the common question of "whether State Farm breached Plaintiffs' standard-form contracts by deducting labor depreciation from their ACV payments" predominated over individualized issues); *Stuart v. State Farm Fire & Cas. Co.*, 910 F.3d 371, 376 (8th Cir. 2018) (affirming class certification, noting that the parties generally agreed with the methodology for determining ACV and "only dispute is over including labor depreciation in the calculation, which is a discrete portion of the formula that is easily segregated and quantified."); *Mitchell v. State Farm*, 954 F.3d 700, 710–712 (5th Cir. 2020) (whether State Farm breached contract by depreciating labor as part of ACV calculation predominated over any individual questions pertaining to other portions of the ACV calculation); *Paris v. Progressive Am. Ins. Co.*, No. 19-21761-CIV, 2020 U.S. Dist. LEXIS 212127, at *18 (S.D. Fla. Nov. 13, 2020) (the questions of "whether the policy language requires Progressive to pay sales tax and transfer fees as part of the ACV of a vehicle are common to all class members") (cleaned up); *Sos v. State Farm Mut. Auto. Ins. Co.*, No: 6:17-cv-890-Orl-40LRH, 2019 U.S. Dist. LEXIS 139680, at *10 (M.D. Fla. May 2, 2019) (same); *Lewis v. Gov't Empls. Ins. Co.*, 2022 WL 819611, at *8 (D.N.J. March 18, 2022) (whether GEICO's application of a discrete adjustment constituted a breach and whether failure to include sales tax in ACV were common, predominating issues).

This case is no different. As set forth below, Plaintiffs have common proof that application of the PSA constitutes a breach of contract. As such, like in all these cases (and others) challenging a discrete element of the ACV calculation through common proof, common issues predominate.

**2. The elements of Plaintiffs' breach of contract claim are subject to common proof that predominate over individual questions.**

Commonality and predominance are satisfied because whether Progressive's application of the PSA to comparable vehicles' listed prices constitutes a breach of the form Policy is subject

to common proof, and, thus, its answer will apply equally to all Class members. Whether a breach occurred turns on two key questions, both of which are subject to common evidence: (1) whether the PSA deduction is baseless and invalid, considering the data ignored and discarded from the calculation and evidence about dealer pricing practices in the modern used car market, and (2) whether under the standard appraisal "comp" method, the invalid PSA deduction may be excised from insureds' valuation reports to arrive at a proper ACV amount. Moreover, all Class members were subject to the same Policy language and business practices. Retton Dep. at 26–29.

The central question is whether application of the PSA means, as Plaintiff suggests, Progressive is not calculating "market value" as contractually required but is, instead, calculating an artificially reduced amount. *See Volino*, 2023 U.S. Dist. LEXIS 44666, at *22 ("[T]he key question for both claims and for all classes and subclasses is, in substance, whether the PSA reflects how cars are valued and sold in the market."); *Smith v. S. Farm Bureau Cas. Ins. Co.*, 18 F.4th 976, 980–81 (8th Cir. 2021) (holding that if it were true that the PSA is "contrary to industry practices and consumer experiences and therefore not reflective of the vehicle's fair market value, then the insurance company did not consider the truck's fair market value; it considered an artificially lower value, in breach of its contractual duty") (cleaned up); *see also Clippinger v. State Farm Mut. Auto. Ins. Co.*, No. 2:20-cv-2482-TLP-cgc, 2022 WL 17592417, at *6 (W.D. Tenn. Sept. 26, 2022) (holding that insured stated a contract claim where insurer used a uniform deduction to account for consumer negotiating behavior and stating "[t]he issue here instead is whether Defendant knowingly and without explanation reduced the cash value for Plaintiff's total loss vehicle using a single line-item deduction in its routine claims-settlement practice").

Resolving this issue is the crux of this case and will resolve the dispositive issue in every Class member's claim, satisfying the commonality and predominance requirements. In Alabama,

"[t]he elements of a breach-of-contract claim are: (1) the existence of a valid contract binding upon the parties in the action, (2) the plaintiff's own performance; (3) the defendant's nonperformance, or breach, and (4) damage." *Armstrong Bus. Servs., Inc. v. AmSouth Bank*, 817 So. 2d 665, 673 (Ala. 2001) (internal citation and quotation marks omitted). It cannot be disputed that the first three elements are subject to common proof, as Progressive has already identified every total-loss insured who paid premiums and was covered by a policy during the relevant time-period.

The breach and damages elements are also subject to common proof: (i) the form Policy language applicable to every Class member, which establishes the relevant duty; (ii) expert testimony that dealerships price to market and therefore the list price of comparable vehicles is reflective of cash market value, as reflected by even Progressive's own purposely truncated market data and by the DMV data; and (iii) expert testimony that the PSA is unjustified, arbitrary, capricious, and not reflective of the used car market. None of the testimony is particular to a given vehicle: Plaintiffs' statistical experts will provide their analysis that the PSA is not supported by a proper statistical methodology or by the data, which the jury will find persuasive or not, but it is not particular to specific vehicles. Felix will testify that, as reflected in the data, car dealers price to market, which the jury will find persuasive or not—either way, such testimony applies classwide. Merritt will testify that the way to identify ACV is to take the average of comparable vehicles, adjusted for differences in mileage, equipment, and condition—in other words, the Mitchell method but without the PSA.

In sum, Plaintiffs will proffer a uniform method of calculating ACV—namely, the very methodology utilized by Mitchell but without the PSA, because of common evidence that it is invalid, conflicts with market forces and vast empirical evidence, and is not a proper element in calculating ACV. For this reason, a court analyzing materially identical claims had little difficulty

in finding common issues were likely to predominate and class treatment was appropriate. *Volino*, U.S. Dist. LEXIS 44666. In *Volino*, like here, Progressive calculated ACV by taking the average price of comparable vehicles, adjusted for documented differences in options, mileage, and equipment. *Id*. at *9. But also, like here, it applied the capricious and baseless PSA to the list price of comparable vehicles. *Id*. And like here, the plaintiffs claimed this adjustment was based on rigged, cherry-picked data, conflicted with actual market forces, and was inconsistent with sound appraisal methodology. *Id*. Based on the evidence presented—which is the exact same evidence presented here—the court found "the critical common questions identified by Plaintiffs predominate over [any] individual inquiries." *Id*. at *24. After all, "[i]f the factfinder accepts Plaintiffs' evidence on the state of the market, then simply recalculating the valuation using Progressive's methodology without the PSA will accurately value each class member's vehicle." *Id.* at *27.[4]

### 3. Plaintiffs' damages model fits their theory of liability, and any individual issues of damages cannot predominate over common issues of liability.

As set forth above, whether Progressive breached the contract by failing to consider actual market value in calculating ACV can be shown through common evidence. Next, the measure of damages can also be shown through common evidence, and that measure of damages fits Plaintiffs' liability theory. Plaintiffs' theory on the merits is that, because an honest look at vast empirical data, consistent with expert testimony from those with knowledge of how the used auto market works, confirms that vehicles typically sell for their list price, and because any adjustments to the price of comparable vehicles must be based on verified information, not foregone conclusions, the

---

[4] Courts routinely find predominance of common issues is established in the specific context of breach of form insurance contracts where the plaintiff claims underpayment of ACV for a discrete reason. *E.g., Stuart*, 910 F.3d at 375; *Hicks*, 965 F.3d at 459-60; *Roth*, 2018 U.S. Dist. LEXIS 226658, at *13-14.

listed price of comparable vehicles adjusted for differences in mileage, options, and condition (which Progressive imposes and Plaintiff does not challenge) constitutes the actual cash market value of an insured vehicle. If a jury agrees, damages are a ministerial calculation: the difference between the Market Value calculated in each Class Member's Mitchell Report with the PSA deductions and the actual market value amount, which is the Mitchell amount except without those deductions, plus applicable sales tax on that difference and prejudgment interest. Merritt Rep. at 7-8; Lacey Rep. at 12-13; *see also* Newberg on Class Actions § 12:2 ("a common method for showing individual damages—a simple formula could be applied to each class member's … records—[is] sufficient for the predominance [] requirement[] to be met.").

This damages model is consistent with Plaintiffs' theory of liability. *See Volino*, 2023 U.S. Dist. LEXIS 44666, at *32 ("Because Plaintiffs take the position that the PSA should not exist at all, a damages model based on simply removing the PSA and re-running the valuations matches Plaintiffs' liability theory."). Other than the application of the PSA, Plaintiffs agree with how ACV was calculated by Mitchell, *i.e.*, the "comp" method. *See* Merritt Rep. at 7. Numerous cases across the country have been certified as class actions where plaintiffs presented evidence that one step in a multistep appraisal process is improper and proposed a damages model of excising the offending portion.

Most notably, in *Volino*, the court agreed that "[i]f the factfinder accepts Plaintiffs' evidence on the state of the market, then simply recalculating the valuation using Progressive's methodology without the PSA will accurately value each [] vehicle." *Id*. at *27. And as such, "a damages model based on simply removing the PSA and re-running the valuations matches Plaintiffs' liability theory." *Id*. at *32. Indeed, the court granted certification on identical facts. There, as here, the plaintiffs challenged the PSA deductions. *Id*. at *7. There, as here, they alleged

the PSAs were unfounded and illegitimate. *Id.* And there, as here, plaintiffs' expert opined that Progressive's reports documented a sound appraisal of ACV following a comp methodology once the PSAs are removed. *Id.* at \*11. Thus, the court found that plaintiffs' "damages model based on simply removing the PSA and re-running the valuations matches Plaintiffs' liability theory." *Id.* at \*32. This is precisely the case Plaintiffs bring here.

Courts have similarly sustained class treatment where insureds challenged discrete components of ACV appraisals. For example, in *Slade*, the plaintiffs alleged Progressive used an invalid source to calculate the base value—that is, before condition adjustments are made based on inspection of the loss vehicle—of their totaled vehicles. 856 F.3d at 411. Like here, the plaintiff did *not* contend that the entire valuation must be scrapped, but only the offending portions. *Id*. The court found the theory of liability and damages matched:

> By essentially rerunning Defendant's calculation of ACV but with a lawful base value, Plaintiffs' damages theory only pays damages resulting from the allegedly unlawful base value. Because this condition adjustment is a separate and unrelated step from the calculation of base value, there is no principled reason why Defendant's own condition adjustment scores could not be used to adjust base values derived from NADA or KBB.

*Id*.; *accord Volino*, 2023 U.S. Dist. LEXIS 44666, at \*33–34. The only distinction here is one without a difference: Rather than scrapping the base value wholesale and substituting another source in its place, Plaintiffs' evidence will show that, like in *Volino*, the offending PSA deductions can simply be excised from the base value calculation, keeping the other (valid) components of the valuation. Notably, lower courts applying *Slade* have had little difficulty certifying claims challenging a single problem with an ACV determination and putting on evidence of how to fix that problem, while keeping the non-offending portions. *See Shields*, 2022 WL 37347, at \*8; *Sampson*, 2022 WL 1415652, at \*8; *see also Lewis*, 2022 U.S. Dist. LEXIS 48737.

Likewise, the Fifth, Sixth, and Eighth Circuits have affirmed class certification in the more complicated real-property context where plaintiffs challenged one step in a multistep appraisal process and proposed a damages model of excising the offending portion of the valuation and accepting the rest. *See, e.g.*, *Hicks*, 965 F.3d at 460–61; *Mitchell*, 954 F.3d at 710–711; *Stuart*, 910 F.3d at 375–76. In *Hicks*, the plaintiffs alleged State Farm failed to properly calculate ACV by improperly deducting labor depreciation. 965 F.3d 452. There, the plaintiffs' theory of liability was that, but for this one improper line-item adjustment, they would have received a proper ACV payment. *Id.* at 456. And, as here, they presented a damages model that excised that single deduction. *Id.* at 460.

As these courts explained, this is true even if insurers argue there may have been an *over*payment as to an unchallenged aspect of the ACV calculation. In *Hicks*, State Farm argued that even if it were not permitted to depreciate labor, "it may have miscalculated ACV payments based on individualized errors unrelated to depreciating labor costs" and these errors may have exceeded the depreciation amount:

> Put another way, State Farm intends to defend against the claims of individual class members by proving that some insureds were not damaged because it either overestimated ACV payments to such a degree that the deduction of labor depreciation resulted in no damages or it mistakenly reimbursed labor depreciation costs to RCV claimants for more than they were owed.

*Id*. at 460*.* The Sixth Circuit rejected this argument because "'any overestimation . . . simply operates as an error in the insured's benefit.'" *Id*. at 461 (quoting *Stuart*, 910 F.3d at 376-77)*.* And even if "this sub-issue were to become relevant at the merits stage," it might be resolvable through subclasses or bifurcation. *Id.* at 462. Likewise, the Fifth Circuit stressed that "whether State Farm made an error in estimating" other elements of the ACV calculation "is a question separate from

this class litigation," and left it to the district court to determine "how to handle sub-issues that may or may not arise in granting class relief." *Mitchell*, 954 F.3d at 711.

Finally, the Eighth Circuit also rejected the insurer's argument, holding that "the only dispute is over including labor depreciation in the calculation, which is a discrete portion of the formula that is easily segregated and quantified." *Stuart*, 910 F.3d at 376. This is consistent with *Volino*, which explained that arguments that Progressive may have overvalued some other aspect of the ACV calculation "are speculative and would not defeat predominance even if they were relevant." 2023 U.S. Dist. LEXIS 44666, at *29.

Of course, the opposite is also true—if the plaintiff fails to present any evidence of ACV, let alone common evidence, courts have rejected class certification. *See, e.g.*, *Lara v. First Nat'l Ins. Co. of Am.*, 25 F.4th 1134 (9th Cir. 2022). In *Lara*, for example, the plaintiff contested a condition adjustment because it was not sufficiently "itemized" in alleged violation of a technical regulatory requirement but did not claim the adjustment was inaccurate and led to an undervaluing of the vehicle. *Id.* at 1139 (noting that the plaintiff's argument was that he only needed to show a failure to itemize, not a failure to itemize and an actual underpayment). While the plaintiff presented common evidence of a technical regulatory violation, he did not present any evidence of actual underpayment, and thus inherently did not present common evidence. Here, by contrast, Plaintiffs are alleging and presenting evidence of underpayment—the only question is whether, like in *Volino*, *Slade*, *Sampson*, *Shields*, *Lewis*, *Hicks*, *Stuart*, and *Mitchell*, absent class members could also rely on such evidence in making a prima facie case were they to bring an individual action. And the answer, as set forth above, is clearly "yes."

Here, the predominant question is whether Progressive's application of the PSA means it was not considering market value and was instead considering an artificially deflated value. *See*

*Smith*, 18 F.4th at 980-81. If so, the clear remedy—just as in the numerous cases discussed above—is awarding damages calculated by considering actual market value, which means backing out the PSA deduction from the Mitchell reports. But even if the jury rejects such measure of damages, class treatment is appropriate—this Court would possess numerous options, including notifying Class members the jury determined Progressive breached its contract by failing to consider market value, but that each Class member may need to take additional steps to establish individual damages. *See In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 141 (2d Cir. 2001). And "'[t]he need for individualized damages decisions does not ordinarily defeat predominance[.]" *In re Target Corp. Customer Data Sec. Breach Litig.*, 309 F.R.D. 482, 488 (D. Minn. 2015).

### C. The Remaining Rule 23(a) Prerequisites Are Met

#### 1. The Class is numerous such that joinder is impracticable.

Fed. R. Civ. P. 23(a)(1) requires that the proposed Class be so numerous that joinder is impracticable. *Armstead v. Pingree*, 629 F. Supp. 273, 279 (M.D. Fla. 1986). Progressive produced claims data for the putative Class showing there are over 17,000 members of the Class. Lacey Rep. at 9–12. This easily satisfies Rule 23(a)(1).

#### 2. Plaintiffs are typical of, and will adequately represent, the Class.

Under Rule 23(a)(3), typicality is established where the claims of class members and named plaintiffs, "arise from the same event or pattern or practice and are based on the same legal theory." *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984). If the legal theory is the same, a "factual variation will not render a [] representative's claim atypical unless [her] factual position… ***markedly differs*** from that of other members of the class." *Id.* (emphasis added).

Progressive's practices are uniform. It is undisputed that the form Policies contain identical language, and that Progressive applied a PSA to the listed price of comparable vehicles for every Class Member, which is the practice that gave rise the claim. *see* Lacey Rep. at p. 11 and Exhibit 4 thereto. This case will turn on whether this uniform practice is authorized by the plain language of Defendants' Policy. The claims arise from the same "course of conduct" and share the same essential characteristics. *See In re Domestic Air Transp. Antitrust Litig.*, 137 F.R.D. 677, 698-99 (N.D. Ga. 1991) (typicality established where claims were based on same airline pricing antitrust theory notwithstanding that "members of the class purchased many tickets at different prices according to varying conditions, [because] the ***nature*** of their claims remains the same") (emphasis added).

Plaintiffs also satisfy the Rule 23(a)(4) adequacy requirement. *See In re MDC Holdings Sec. Litig.*, 754 F. Supp. 785, 801 (S.D. Cal. 1990) (explaining that "[e]ven though the typicality and adequacy [] requirements are separate, the concerns [they address] overlap a great deal."). Because Plaintiffs' claims are typical of the Class, their interests are not antagonistic—certainly, there is no threat this litigation could benefit some Class members but harm others. *See Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003) (a conflict precludes class representation only where "some party members claim to have been harmed by the same conduct that benefitted other [class] members[.]"). All Class members would benefit from a finding that the PSA is improper and constitutes a breach.

The second adequacy prong asks whether class counsel is "qualified, experienced and will competently and vigorously prosecute the suit." *Powers v. Government Employees Ins. Co.*, 192 F.R.D. 313, 317 (S.D. Fla. 1998). Plaintiffs retained qualified counsel with experience litigating

class action cases and are committed to expending the resources to prosecute this claim. Bates Decl. at ¶¶ 2-4. Both Rule 23(a)(4) and Rule 23(g) are satisfied. *See* Fed. R. Civ. P. 23(g)(1).

### D.  Class Treatment Is Superior

Factors relevant to determining whether class treatment is superior to other forms of adjudication are: (A) any interest in individually controlling prosecution; (B) whether any litigation has already commenced; (C) the desirability of concentrating litigation; and (D) manageability. Fed. R. Civ. P. 23(b)(3).

Here, Plaintiff Reynolds's PSA damages are $714.59 and Plaintiff Penn's are $847.00. Lacey Rep. at 14. This is relatively small compared to the cost of litigating against a large insurance company. That the cost of litigation outweigh the expected recovery—a "negative value" suit—is often dispositive of superiority. *See Smith v. Ga. Energy United States*, 259 F.R.D. 684, 697 (S.D. Ga. 2009). Presumably for this reason, Plaintiffs are unaware of any litigation in Alabama alleging the same or similar claims. *See Klay v. Humana, Inc.*, 382 F.3d 1241, 1269 (11th Cir. 2004). In any event, it is desirable to concentrate litigation: Class treatment will conserve judicial resources and offer "substantial economies of time, effort and expense[.]" *Id*. at 1280.

Finally, class treatment is manageable. Liability will be established through common evidence of Progressive's uniform Policy provisions and method for valuing total loss claims. Even if management was likely to be difficult—and to be clear, it will not—the comparison is to individual litigation, not no litigation at all. *See Klay*, 382 F.3d at 1273. To be sure, class treatment is more manageable than 17,000 individual cases, which is why manageability concerns rarely, if ever, preclude class treatment. *Id*. at 1272-73. But frankly, there are no manageability concerns here—identifying Class members is formulaic and based on objective, verifiable data in Progressive's records. Lacey Rep. at 9-12.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs' Motion should be granted.

Dated: July 26, 2023                           Respectfully Submitted,

**CARNEY BATES & PULLIAM, PLLC**

*/s/ Lee Lowther*
Hank Bates (admitted *pro hac vice*)
Lee Lowther (admitted *pro hac vice*)
519 W. 7th Street
Little Rock, AR 72201
Tel: (501) 312-8500
Fax: (501) 312-8505
Email: hbates@cbplaw.com
Email: llowther@cbplaw.com

**BAILEY & GLASSER LLP**
David L. Selby II
Alabama Bar No. ASB-6994-Y62D
3000 Riverchase Galleria, Suite 905
Birmingham, AL 35244
Tel: (205) 988-9253
Fax: (205) 733-4896
Email: dselby@baileyglasser.com
Email: vpierre@baileyglasser.com

**SHAMIS & GENTILE, P.A.**
Andrew J. Shamis (admitted *pro hac vice*)
Florida Bar No. 101754
14 NE 1st Avenue, Suite 705
Miami, FL 33132
Tel: (305) 479-2299
Email: ashamis@shamisgentile.com

**EDELSBERG LAW, P.A.**
Scott Edelsberg
Florida Bar No. 0100537
Christopher Gold
Florida Bar No. 088733
20900 NE 30th Avenue, Suite 417
Aventura, FL 33180
Tel: (786) 289-9471
Direct Tel: (305) 975-3320
Fax: (786) 623-0915
Email: scott@edelsberglaw.com
Email: chris@edelsberglaw.com

*Counsel for Plaintiffs and the Proposed Classes*

24

## CERTIFICATE OF SERVICE

I, Lee Lowther, hereby certify that on this date July 26, 2023, I filed the foregoing with the Clerk of the Court via the Court's electronic filing system, which will provide electronic mail notice to all counsel of record.

/s/ Lee Lowther
Lee Lowther