FILED
2024 Apr-03 PM 02:19
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **LAUREN REYNOLDS, *et al.*,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 5:22-cv-503-LCB** |
| | ) | |
| **PROGRESSIVE DIRECT** | ) | |
| **INSURANCE CO., *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>ORDER</u>

In April of 2022, Lauren Reynolds and Lauri Penn sued Progressive Direct Insurance Company and Progressive Specialty Insurance Company (collectively, "Progressive") on behalf of themselves and all others similarly situated in Alabama, claiming that Progressive breached its policy by wrongfully applying a "projected sold adjustment" in its appraisal of their totaled cars. Their claims are hardly novel: a raft of materially identical lawsuits have been filed against auto-insurers nationwide, many (but not all) of which have recently been certified as class actions.

Reynolds and Penn have moved for class certification. (Doc. 63). The motion has been fully briefed (Docs. 63, 77 & 90), each side has augmented their briefing with supplemental authority (Docs. 80, 88, 89, 91, 92, 95, 98, 108 & 115), and on March 7, 2024, the Court heard argument on the motion in open court. Having considered the parties' briefs, their arguments at the March 7 hearing, and the

applicable law, the Court **GRANTS** Plaintiffs' Motion for Class Certification. (Doc. 63).

## I.   BACKGROUND

On February 21, 2017, Lauren Reynolds wrecked her Kia Forte when she was T-boned by cross traffic in the middle of an intersection. (Doc. 48-2 at 1; Doc. 77-26 at 8-9). At the time of the accident, Reynolds was insured by Progressive Direct Insurance Company under an Alabama Auto Policy, through which she submitted a property-damage claim to Progressive for the damaged car. (Doc. 48 at 6). Progressive declared the Forte a total loss. (Doc. 48 at 6; Doc. 48-2).

For Lauri Penn, this suit began on November 23, 2018, when she struck a deer with her mother's Kia Optima. (Doc. 48-3 at 1; Doc. 77-24 at 19). Though the car was not her own, it was covered by Penn's Alabama Auto Policy with Progressive Specialty Insurance Company, and Penn submitted a property-damage claim to Progressive for the damage from the accident. (Doc. 48-3). Progressive declared the Optima a total loss. (Doc. 48 at 6).

For Reynolds, Penn, and all putative class members, Progressive issued auto-insurance coverage using form policies with materially identical language. (Doc. 63-2 at 26-29; Doc. 63-3). Under Part IV of the form policy, Progressive guaranteed that it would pay for "sudden, direct and accidental loss to a . . . covered auto," (Doc. 63–3 at 13), although its liability in the event of a total loss would be capped

at "the **actual cash value** of the stolen or damaged property at the time of the loss reduced by the applicable deductible," *id.* at 18 (emphasis added). The policies further provided that Progressive "determine[s]" the actual cash value (or "ACV") "by the market value, age, and condition of the vehicle at the time the loss occurs." *Id.* at 19.

In practice, Progressive delegates the computation of a totaled vehicle's ACV to a third-party vendor, Mitchell International Inc., whose "Total-Loss WorkCenter" ("WCTL") software automates most of the valuation process. (Doc. 64–2 at 37–40, 55–59). Using WCTL, a Progressive adjuster provides Mitchell with information about the claimant's vehicle, which Mitchell runs through a series of line-item adjustments to generate the loss-vehicle's market value. *See id.* All this information is then returned to Progressive in a valuation report. *Id.*

To generate the report, Mitchell first gathers the list prices for comparable vehicles sold or advertised for sale in the claimant's region. *Id.* at 37, 51, 59. The list prices of those comp vehicles advertised for sale but not yet sold are then adjusted to "reflect consumer purchasing behavior" through a reduction known as a "Projected Sold Adjustment" ("PSA"). *Id.* at 42-43, 145. These comp vehicle prices are then adjusted once more to account for any differences in the vehicles' equipment, mileage, and configurations. (Doc. 64-5 at 142-43). After this, Mitchell averages the comp vehicles' adjusted prices to get the loss vehicle's "base market

value," which is itself modified as necessary to account for the totaled vehicle's own pre-loss condition in a process that yields the vehicle's "adjusted" market value. *Id.* at 144–47. Finally, Mitchell subtracts any taxes, fees, and deductible from the adjusted market value, and the difference is the "settlement value"—the final price Progressive will pay the claimant. (Doc. 64–2 at 74).

This case turns on the first of those downward adjustments—the PSA. As Progressive's valuations suggest, the PSA's core economic assumption is that dealerships systematically list vehicles above market price, while buyers uniformly negotiate that price down to the vehicle's true market value. (Doc. 64–2 at 42–43, 75; Doc. 63-6). According to Plaintiffs' expert, this modification averages nearly 8% of a vehicle's market value, a deduction with the practical result of reducing Progressive's ACV determination on average more than $700. (Doc. 64–10 at 13-14).

So why doesn't the PSA reflect market realities? Plaintiffs contend that the theory behind the PSA is, at best, outmoded: If dealers ever listed cars above market price in the expectation that customers would bargain their way to the true market value, they did so "*many* years before the Class period." (Doc. 63 at 5). The PSA, in their view, is a relic of the bygone age when customers shopped for cars in person by browsing stock at local dealerships, back when prices were difficult to compare beyond the local market and dealers were able to exploit this difficulty. *Id.* at 5–6;

(Doc. 63-8 at 2-3). But for years now, they say, "[i]nternet advertising and sophisticated pricing tools" have allowed dealers and consumers alike to check prices for comparable vehicles in a far broader market, and dealers who refuse to price to market are squeezed out by the competition. (Doc. 63 at 5-6). Put simply, consumers can now compare advertised prices with ease, so dealers rarely price vehicles over list. (Doc. 63-8 at 2-3). In this new market, say Plaintiffs, Progressive no longer need apply the PSA to determine a vehicle's ACV—if it ever needed to in the first place. (Doc. 63 at 6).

Not that all vehicles *sell* for their list price. As Plaintiffs are quick to note, vehicles might sell below their advertised price for a host of reasons: the buyers might get a family discount, for instance, or the dealer might offset the value with a trade-in vehicle. *Id.* at 6. But while these adjustments might mean that a buyer *pays* less for a new car, such adjustments "have nothing to do with the actual market price of a vehicle"; nothing to do, that is, with its *actual cash value*. *Id.*; (Doc. 63-8 at 8).

Thus, Plaintiffs say, Mitchell's calculation ignores a great deal of relevant market data: it excludes all transactions where the sales price exceeded the list price, plus, until July 2021, "every transaction where the vehicle sold for list price." (Doc. 63 at 6-7). By Plaintiffs' reckoning, these transactions are hardly outliers: those selling at list price alone account for such a large share of the transactions that when factored back in, the calculation results in a "negligible" difference between

the list price and the sold price. *Id.* at 8. Plaintiffs call this unjustified exclusion "thumbing the scales" in Progressive's favor. *Id.* at 10. In their view, Progressive "intentionally distorts the data, excludes transactions that undercut its false hypothesis, and ignores market realities, all for the purpose of applying a capricious and unjustified Projected Sold Adjustment to artificially deflate the value of total loss vehicles." (Doc. 48 at 4).

So how should Progressive calculate ACV? According to Plaintiffs' appraisal expert, Progressive should follow the method it uses now and simply excise its line-item adjustment for the PSA. (Doc. 63-9 at 7-9). Since "any adjustment must be based on observed, documented, and verified data," Mitchell's method—PSA excluded—otherwise provides "a detailed, sound appraisal of each loss vehicle that Progressive presents to [claimants] as ACV." (Doc. 63 at 6; Doc. 63-9 at 2-4, 7-9).

Plaintiffs thus argue that Progressive breached its duty to "determine" their vehicles ACV "by market value" by applying the PSA, and, in so doing, caused damages in amounts Plaintiffs would have been paid had Progressive applied the proper methods and appraisal standards. (Doc. 48 at 1-2, 13-17) (*Id.* at ¶ 51). Since they claim these two elements are amenable to common proof, Plaintiffs move the Court to certify two classes:

> **Progressive Direct Class:** All persons who made a first-party claim on a policy of insurance issued by Progressive Direct Insurance Company to an Alabama resident where the claim was submitted from April 20, 2016, through the date an order granting class certification is entered,

and Progressive determined that the vehicle was a total loss and based its claim payment on an Instant Report from Mitchell where a Projected Sold Adjustment was applied to at least one comparable vehicle.

**Progressive Specialty Class:** All persons who made a first-party claim on a policy of insurance issued by Progressive Specialty Insurance Company to an Alabama resident where the claim was submitted from April 20, 2016, through the date an order granting class certification is entered, and Progressive determined that the vehicle was a total loss and based its claim payment on an Instant Report from Mitchell where a Projected Sold Adjustment was applied to at least one comparable vehicle.

(Doc. 63-7). Plaintiff Reynolds is the proposed class representative for the Progressive Direct Class, and Plaintiff Penn is the proposed class representative for the Progressive Specialty Class. (Doc. 48 at 14).

## II.    LEGAL STANDARDS

District courts have "broad discretion in determining whether to certify a class." *Washington v. Brown & Williamson Tobacco Corp.*, 959 F.2d 1566, 1569 (11th Cir. 1992). To certify a class, courts must find that the named plaintiff has standing and the putative class satisfies both Rule 23(a)'s prerequisites for class certification and at least one of the requirements found in Rule 23(b). *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1267 (11th Cir. 2019). The burden of proof lies with the party seeking class certification, who "must affirmatively demonstrate his compliance with Rule 23 by proving that the requirements are *in fact* satisfied." *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1234 (11th Cir. 2016) (cleaned up).

The prerequisites for class certification are numerosity, commonality, typicality, and adequacy of representation. *See* FED. R. CIV. P. 23(a); *see also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997). The class, in other words, must be such that (1) "joinder of all members is impracticable," (2) there are "questions of law or fact common to the class," (3) the "named parties' claims or defenses are typical . . . of the class", and (4) the "representatives will fairly and adequately protect the interests of the class." *Id.*

Beyond these prerequisites, a named plaintiff must also show that the putative class "satisfies at least one" of Rule 23(b)'s three listed requirements. *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012). Among these requirements is a finding "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). In so finding, courts should consider

    (A) the class members' interests in individually controlling the prosecution or defense of separate actions;

    (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

    (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

    (D) the likely difficulties in managing a class action.

*Id.*

Although the decision to certify a class comes too early in a case to "determine" its merits, courts "can and should consider" them "to the degree necessary to determine whether the requirements of Rule 23 will be satisfied." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256,1266 (11th Cir. 2009).

## III. DISCUSSION

Reynolds and Penn sue on behalf of themselves and all other Alabama residents who received PSA-adjusted payments from Progressive for their totaled vehicles. Like Reynolds and Penn, plaintiffs throughout the country have challenged the use of the PSA on materially identical claims, be they against Progressive or some other auto-insurer, and in most cases in which the matter has been decided courts have certified the class.[1]

Reynolds and Penn now move for class certification on the grounds that the proposed classes are ascertainable and satisfy all requirements of Rules 23(a) and 23(b)(3). (Doc. 63). The motion is opposed on all fronts: according to Progressive, Reynolds and Penn lack Article III standing; the proposed classes fail to satisfy Rule

---

[1]*See Chadwick v. State Farm Mutual Ins. Co.*, No. 4:21-CV-1161-DPM, 2024 WL 1156944, at *1 (E.D. Ark. Mar. 18, 2024)*; Schroeder v. Progressive Paloverde Ins. Co., et al.*, 1:22-cv-00946-JMSMKK (S.D. In. Jan. 26, 2024); *Costello v. Mountain Laurel Assurance Co.*, No. 2:22-CV-35, 2024 WL 239849, at *1 (E.D. Tenn. Jan. 22, 2024); *Curran v. Progressive Direct Ins. Co*., No. 22-CV-00878-NYW-MEH, 2023 WL 8715699, at *1 (D. Colo. Dec. 18, 2023); *Clippinger v. State Farm Mut. Auto. Ins. Co.*, 2023 WL 7213796, at *1 (W.D. Tenn. Aug. 25, 2023); *Drummond v. Progressive Specialty Ins. Co.*, 2023 WL 5181596, at *1 (E.D. Penn. Aug. 11, 2023); *Brown v. Progressive Mountain Ins. Co.*, 2023 WL 7219499, at *1 (N.D. Ga. Aug. 3, 2023); *Volino v. Progressive Cas. Ins. Co.*, 2023 WL 2532836, at *1 (S.D.N.Y. Mar. 16, 2023); *but see Ambosio v. Progressive Preferred Ins. Co.*, No. CV-22-00342-PHX-SMB, 2024 WL 915184, at *1 (D. Ariz. Mar. 4, 2024); *Kroeger v. Progressive Univ. Ins. Co.* No. 4:22-cv-00104-SHL-HCA, 2023 WL 9059523, at *8 (S.D. Iowa Nov. 20, 2023); *Williams v. Progressive Cnty. Mut. Ins. Co.*, 2020 WL 7078888 (S.D. cal. Dec. 3, 2020); and *Curtis v. Progressive Northern Ins. Co.*, 2020 WL 2461482 (W.D. Ok. May 12, 2020).

23(a)'s requirements of commonality, typicality, and adequacy; and, contrary to Rule 23(b)(3), the questions of law or fact that affect only individual members predominate over those common to class members, and a class action is inferior to other available methods of fairly and efficiently adjudicating the controversy. (Doc. 77).

For the reasons discussed below, the Court concludes that class certification is appropriate. Penn and Reynolds have standing to sue, and the proposed classes are ascertainable; the proposed classes satisfy Rule 23(a)'s prerequisites of numerosity, commonality, typicality, and adequacy of representation; and, as required by Rule 23(b)(3), (1) common questions "predominate over any questions affecting only individual members," and (2) class resolution is "superior to other available methods for fairly and efficiently adjudicating of the controversy." FED. R. CIV. P. 23(b)(3).

### A.    Penn and Reynolds have Article III standing.

Before certifying a class, the Court "must determine that at least one named class representative has Article III standing to raise each class [claim]." *Wolf Prado-Steiman v. Bush,* 221 F.3d 1266, 1279 (11th Cir. 2000). Reynolds and Penn can establish Article III standing by showing that (1) they "suffered an injury in fact," (2) their injury "is fairly traceable to [Progressive's] challenged conduct" and (3) their injury "is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

Here, Progressive disputes only whether Reynolds and Penn suffered an injury in fact—Reynolds, because she never received a payment from Progressive, and Penn, because she didn't own the loss vehicle. Both arguments are without merit. (Doc. 77 at 26-27).

According to Progressive, Reynolds suffered no injury because she received no payment; her settlement went directly to the lienholder. *Id.* What's more, says Progressive, her GAP insurer "covered an additional amount," so it's "unclear how much injury, if any," she suffered. *Id.* This theory is meritless.

Injuries under Article III "[do] not depend on allegation[s] of financial loss." *Springer v. Cleveland Clinic Emp. Health Plan Total Care*, 900 F.3d 284, 287 (6th Cir. 2018); *see also HCA Health Servs. Of Georgia, Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 991 (11th Cir. 2001), *overruled on other grounds by Doyle v. Liberty Life Assur. Co. of Boston*, 542 F.3d 1352 (11th Cir. 2008). In the related context of medical-insurance claims, for example, courts have often held that a plaintiff can sue for denial of coverage even if she has not suffered the financial loss herself; for purposes of Article III standing, an insurance carrier's denial of benefits is a concrete injury on its own, even if the carrier didn't bill the insured for her services directly. *See id.*; *North Cypress Med. Ctr. Operating Co., Ltd. v. Cigna Healthcare*, 781 F.3d 182, 192–93 (5th Cir. 2015) (holding that "a patient suffers a concrete injury if money that she is allegedly owed contractually is not paid,

regardless of whether she has directed the money be paid to a third party for her convenience"). District courts have applied the same reasoning to underpayment of an auto-insurance plan, even when those payments went directly to a lienholder. *See, e.g., Davis v. GEICO Cas. Co.*, 2021 WL 5877843, at *3 (S.D. Ohio Dec. 13, 2021) (finding the denial of a contract's benefit to be an injury sufficient to confer Article III standing even when the auto-insurer's payments would go to the lienholder instead of plaintiffs).

This reasoning persuades the Court that Reynolds has suffered an Article III injury. If Progressive determined Reynold's ACV to be lower than the amount Reynolds was entitled to under her insurance plan, she has been denied "the benefit of [her] bargain" and suffered a concrete injury. *Springer*, 900 F.3d at 287. This is true "regardless of whether she has directed the money be paid to a third party for her convenience." *Id.*

As for Penn, Progressive contends that she suffered no injury because she didn't own the vehicle: the Optima's listed owner, says Progressive, was her now-deceased mother, and Progressive paid the settlement funds into her mother's bank. (Doc. 77 at 21-22, 26-27). This argument is not only specious; it's belied by the Policy itself.

On page one of the Policy, Progressive made the following guarantee:

> In return for **your** payment of the premium, **we** agree to insure **you** subject to all the terms, conditions and limitations of this policy. **We**

> will insure **you** for the coverages and the limits of liability shown on this policy's **declarations page**. **Your** policy consists of the policy contract, **your** insurance application, the **declarations page**, and all endorsements to this policy.

(Doc. 63–3 at 1). The Policy's definition of "you" includes "a person shown as *a named insured* on the declarations page," and under "Payment of Loss" it specifies that Progressive "may settle any loss with you *or* the owner or lienholder of the property." (*Id.* at 2, 19) (emphasis added). True, Progressive "*may* settle" a loss with the vehicle's owner, as Progressive implies, but it may also settle the loss with "you"—"a named insured." *Id.*

Penn is a named insured. As she testified at her deposition, it was she who applied for Progressive's coverage, and her name was listed as both the "Policyholder" on the application and as one of the vehicle's drivers. (Doc. 77–24 at 7-8, 11). And as a named insured, the Policy entitled her to payment for the Optima's loss, the underpayment of which amounts to a constitutionally recognized injury. *Springer*, 900 F.3d at 287.

Thus, both Reynolds and Penn have Article III standing to pursue their claims.

**B.    The proposed classes are ascertainable.**

In addition to standing, a class plaintiff must show that "the proposed class is adequately defined and clearly ascertainable." *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012) (cleaned up). The threshold issue of "ascertainability" concerns whether the putative class can be identified: "[a]n identifiable class exists

if its members can be ascertained by reference to objective criteria.*" Bussey v. Macon Cnty. Greyhound Park, Inc.*, 562 F. App'x 782, 787 (11th Cir. 2014). To be ascertainable, the proposed class must be "defined such that its membership is capable of determination." *Cherry v. Dometic Corp.*, 986 F.3d 1296, 1304 (11th Cir. 2021).

The classes proposed by Reynolds and Penn are ascertainable. Each criterion for class membership—(1) Alabama residency; (2) coverage under a Progressive Policy; (3) receipt of a payment on a covered total-loss claim within a defined period; and (4) Progressive's use of a Mitchell Report that applied a PSA—is based on objective and verifiable records within Progressive's electronic data base. (Doc. 63-7).

## C.    The proposed classes satisfy the prerequisites of Rule 23(a).

As discussed above, plaintiffs may sue on behalf of a class only if they can show that the class would satisfy Rule 23(a)'s prerequisites: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. *See* FED. R. CIV. P. 23(a); *see Amchem Prods., Inc.*, 521 U.S. at 613. Reynolds and Penn have made such a showing.

### 1.    Numerosity

First, a proposed class must be "so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1). In general, classes of "well over forty

individuals" are sufficiently numerous and "fall within the class definition" that the Eleventh Circuit has adopted. *Vega*, 564 F.3d at 1267. Progressive's data show more than 15,000 potential members in the Progressive Direct Class and more than 17,000 potential members in the Progressive Specialty Class. (Doc. 63-7 at 12). The proposed classes easily satisfy the numerosity requirement.

### 2.    Commonality

Second, Reynolds and Penn must show that "there are questions of law or fact common to the class." FED. R. CIV. P. 23(a)(2). To make this showing, a plaintiff must prove that the class members "have suffered the same injury," and their claims must depend on a common contention the "truth or falsity [of which] will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). A single common question of law or fact is sufficient. *Id.* at 359. The burden on the plaintiff is "relatively light," *Vega*, 564 F.3d at 1268, and "will often be satisfied in cases of form contracts such as insurance policies, so long as the policy documents are uniform or largely the same throughout the case." *Mills v. Foremost Ins. Co.*, 269 F.R.D. 663, 671 (M.D. Fla. Sept. 29, 2010). This prerequisite concerns a class action's capacity "to generate common *answers* apt to drive the resolution of the litigation" rather than "the raising of common 'questions'—even in droves," since "[d]issimilarities within the

proposed class . . . have the potential to impede the generation of common answers." *Wal-Mart Stores, Inc,* 564 U.S. at 350.

According to Reynolds and Penn, proof of their breach-of-contract claim turns on two key questions, each of which is subject to common evidence: (1) whether the PSA deduction is baseless and invalid; and (2) whether the valuation reports would yield a proper ACV through excision of the invalid PSA deduction. (Doc. 63 at 14). For every class member, Progressive's form Policy language would establish its duty, while expert testimony that (i) "dealerships price to market," so "the list price of comparable vehicles" reflects the "cash market value"; and that (ii) "the PSA is unjustified, arbitrary, capricious, and not reflective of the used car market" would establish its breach. *Id.* at 15. Thus, they suggest, because all putative class members were subject to the same policy language and business practices, class litigation is apt to yield common answers for all class members.

Progressive denies that either of these questions could yield common, class-wide answers. In Progressive's view, the validity of the PSA's application is an individualized issue: there may be instances in which the PSA projected too low a price, but there's no way to identify these instances of underprediction without analyzing each class member's transaction individually. (Doc. 77 at 15). As to the second question, Progressive contends that the allegedly simple fix—removing the PSA from the valuation reports—would resolve no claims at all, because the

accuracy of the resulting ACV would still require an appraisal for every vehicle. *Id.* at 19-22.

Progressive's response misses the point. Reynolds and Penn challenge the validity of the PSA itself as a categorical breach of Progressive's duty to "determine" ACV by market value, not, as Progressive suggests, the case-by-case determination of each class member's ACV. The latter would require an in-depth, individualized look at each class member's vehicle and payout; the former is clearly subject to common proof.

Indeed, Reynolds and Penn intend to prove this by presenting common evidence that "each class member could have relied on . . . to establish liability if he or she had brought an individual action," *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 455 (2016): (i) the form policy language applicable to all class members; (ii) expert testimony that dealerships usually price to market and therefore the list price of comparable vehicles is reflective of market value; (iii) expert testimony that the PSA is "unjustified, arbitrary, capricious, and not reflective of the used car market"; and (iv) a uniform method of calculating ACV by removing the PSA from the Mitchell Report. (Doc. 63 at 15). This evidence will yield a class-wide answer: the use of PSAs either violated the contract or it did not. *See Drummond*, 2023 WL 5181596, at *9.

17

The proposed class action therefore "involve[s] issues that are susceptible to class-wide proof," *Mohawk Indus.*, 568 F.3d at 1355, and Reynolds and Penn have satisfied their "relatively light" burden of proving commonality, *Vega*, 564 F.3d at 1268.

### 3.  Typicality

Third, a class representative's claims or defenses must be typical of the claims or defenses of the whole class. FED. R. CIV. P. 23(a)(3); *see also Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984). To establish typicality, a plaintiff must show a nexus between her claims and the common questions of law or fact which unite the class, as when they "arise from the same event or pattern or practice and are based on the same legal theory." *Kornberg*, 741 F.2d at 1337. Simply put, factual variations between the class and class representative do not render the claims "atypical" unless the representative's factual position "markedly differs from that of other members of the class." *Id.*

For the same reasons they contested standing, Progressive contests the typicality of Reynolds's and Penn's class claims—Reynolds's, because her settlement was issued directly to her lienholder, and Penn's, because she didn't own the loss vehicle. (Doc. 79 at 32). Once again, these arguments lack merit.

Here, it is undisputed that Progressive's vehicle-valuation practices and its Policy language were uniform for all policyholders within the state. First,

Reynolds's and Penn's claims and those of each class arise from the same practice: for every class member, Progressive applied a PSA to the listed price of comparable vehicles to determine the loss vehicle's ACV. Second, all claims are based on the same legal question: whether Progressive breached its duty to calculate ACV based on "market value" by applying the PSA. Reynolds and Penn both suffered total-loss claims, and Progressive applied a PSA to the comparable vehicles in both their Mitchell Reports. Thus, for purposes of Rule 23(a)(3), their factual positions do not "markedly differ" from those of either putative class, *Kornberg*, 741 F.2d at 1337, and their claims are typical.

### 4.    Adequacy

Fourth, Reynolds and Penn must show that "the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). The adequacy-of-representation requirement is satisfied when (i) the class representatives have no interests conflicting with the class; and (ii) the representatives and their attorneys will properly prosecute the case. *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003).

Reynolds and Penn claim to be adequate representatives of their respective classes because their interests are not antagonistic; to the contrary, they say, "[a]ll class members would benefit from a finding that the application of the PSA is improper and constitutes a breach." (Doc. 63 at 22). They also claim to have retained

qualified counsel with experience litigating class-action cases and to be committed to expending the resources to prosecute this claim. (*Id.* at 22-23).

Progressive denies that plaintiffs will adequately represent each class, but they do not challenge the adequacy of their counsel. First, it says, Reynolds and Penn have "jeopardize[d]" other class members' claims by focusing exclusively on the application of the PSA and accepting all other parts of the methodology. (Doc. 77 at 27-28). Second, it sees a "fundamental conflict" in the classes as proposed, because each would encompass some individuals who benefitted from Progressive's ACV calculation. *Id.* at 28.

Plaintiffs' decision to challenge the application of the PSA and ignore other aspects of Progressive's methodology poses no threat to the adequacy of their representation. Since certification is sought under Rule 23(b)(3), would-be class members who wish to dispute other aspects of Progressive's methodology may opt out of the class and pursue separate litigation individually if they should so choose. *See* FED. R. CIV. P. 23(c)(2)(B)(v). The putative classes would thus consist of only those claimants who wished to challenge the same aspects of Progressive's methodology as Reynolds and Penn do here.

Nor do the classes contain a fundamental conflict. Progressive's view is that some class members "benefitted" from its ACV calculations, because a different approved method—those endorsed by the National Automobile Dealers Association

("NADA") or Kelley Blue Book ("KBB") for instance—might have meant that a portion of the class would have been paid even less than they were paid under the current method. (Doc. 77 at 28).

Conflicts, however, are "fundamental" when "some class members claim to have been harmed by the same conduct that benefitted other class members." Newberg on Class Actions § 7:31(6th ed. 2023) (cleaned up). That other methodologies might have meant *even lower* payouts to class members does not mean Progressive's adopted methodology benefitted them; if the plaintiffs are right, then applying the PSA still meant Progressive breached its policy and underpaid them. Other courts evaluating this exact argument have come to the same conclusion. *See, e.g., Drummond*, 2023 WL 5181596, at *9 (concluding that "it is possible for Progressive to have paid the putative plaintiffs more than they would have if applying an alternative valuation method yet still have failed to pay the ACV of the putative plaintiffs' vehicles."); *accord Brown*, 2023 WL 7219499, at *5 (rejecting Progressive's argument because the possibility that some class members "would have received even less" under other methodologies did "not render irrelevant the fact that the PSA certainly resulted in a reduction"). Yes, Progressive could have harmed members *more* had it used some other method of determining ACV. But the possibility of greater harm under the NADA standard does not imply a reciprocal benefit from using the PSA; relative privation is still privation.

Simply put, all putative class members would benefit from a finding that Progressive breached the Policy by using the PSA. Reynolds and Penn are thus adequate representatives of the putative class, and their attorneys are qualified to prosecute this case.

### D.    Rule 23(b)(3)

Having met the requirements of Rule 23(a), Reynolds and Penn must show that the putative class meets at least one of the three requirements of Rule 23(b). Here, they've chosen to seek certification under Rule 23(b)(3), which requires that (1) common questions "predominate over any questions affecting only individual members" and (2) class resolution is "superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). In other words, Reynolds and Penn must also show "predominance" and "superiority." *Amchem Prods., Inc.*, 521 U.S. at 615.

### 1.    Predominance

Although "[t]he same analytical principles govern Rule 23(b)" as govern the class-action prerequisites, "Rule 23(b)(3)'s predominance criterion is even more demanding." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013). Courts must therefore "take a 'close look' at whether common questions predominate over individual ones." *Id.* The predominance standard is akin to the commonality requirement of Rule 23 and "tests whether proposed classes are sufficiently cohesive

to warrant adjudication by [class] representation." *Carriuolo v. General Motors Co*, 823 F.3d 977, 985 (11th Cir. 2016). A plaintiff cannot satisfy the predominance requirement if, as a practical matter, common issues will "break[] down into an unmanageable variety of individual legal and factual issues." *Andrews v. Am. Tel. & Tel. Co.*, 95 F.3d 1014, 1023 (11th Cir. 1996).

To begin the predominance inquiry, courts first consider the elements of the underlying cause of action, *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809-10, and then "how a trial on the merits would be conducted if a class were certified." *Sandwich Chef of Texas, Inc. v. Reliance Nat'l Indem. Ins. Co.*, 319 F.3d 205, 218 (5th Cir. 2003). Courts can then weigh common questions against individual ones according to the nature of the evidence: "Common questions are ones where the same evidence will suffice for each member, and individual questions are ones where the evidence will vary from member to member." *Brown*, 817 F.3d at 1234 (cleaned up).

After this classification, the district court decides whether the common questions predominate over the individual ones:

> If common issues truly predominate over individualized issues in a lawsuit, then the addition or subtraction of any of the plaintiffs to or from the class should not have a substantial effect on the substance or quantity of evidence offered. . . . If, on the other hand, the addition of more plaintiffs leaves the quantum of evidence introduced by the plaintiffs as a whole relatively undisturbed, then common issues are likely to predominate.

*Id.* at 1235 (cleaned up).

First, then, the Court considers the elements of plaintiffs' breach-of-contract claim, which are "(1) a valid contract binding the parties; (2) the plaintiffs' performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages." *Shaffer v. Regions Fin. Corp.*, 29 So. 3d 872, 880 (Ala. 2009). As discussed above, Reynolds and Penn contend that each element of their claims can be proved by class-wide, common evidence, including: (i) the form policy language applicable to ever class member; (ii) expert testimony that dealerships price to market and therefore the list price of comparable vehicles reflects cash market value; and (iii) expert testimony that the application of the PSA is unjustified, arbitrary, and capricious. (Doc. 63 at 15). On top of this, Plaintiffs have also proposed a uniform method for calculating ACV—"the very methodology utilized by Mitchell but without the PSA, because of common evidence that it is invalid, conflicts with market forces and vast empirical evidence, and is not a proper element in calculating ACV." *Id.*

Progressive responds with three reasons it believes that *individual* questions predominate. First, says Progressive, there is no common evidence that the methodology used to calculate the PSA is invalid; instead, "the fundamental question of whether the PSA is 'valid' or not relies on evidence that will vary from claim-to-claim." (Doc. 77 at 18-19). Second, even if the factfinder were to conclude that the

PSA is invalid, Plaintiffs could not use common evidence to establish each vehicle's ACV and determine whether Progressive underpaid. *Id.* at 19. And third, the plaintiffs could not determine damages for any member of the class without an individualized inquiry. *Id.* at 20-22. None of these arguments stands to scrutiny.

### (i)    Common Evidence of the PSA's Invalidity

Offering the same straw-man argument that it raised in opposition to commonality, Progressive first contends, in short, that it couldn't breach the Policy unless it paid class members less than their vehicles' ACV; the PSA would be "invalid" only if it led Progressive to undervalue a specific vehicle's ACV, and this determination would vary from claim-to-claim depending on the evidence—the list price of comparable vehicles in a class member's valuation report, for instance, or the likelihood a given dealership would have sold a class member's vehicle for less than Progressive projected.

But this argument is plainly specious. The issue is not, as Progressive suggests, whether a correctly calculated PSA yielded an incorrect ACV; Reynolds and Penn object to the methodological validity of the PSA itself. Progressive promised to determine ACV by "the market value, age, and condition of the vehicle at the time the loss occurs," (Doc. 63-3 at 19), but if Reynolds and Penn are right, then Progressive determines ACV not by market value, but by "an artificial,

downwardly skewed, and deflated 'market' of its own invention." (Doc. 90 at 6). Thus, Plaintiffs contend, *any* application of the PSA amounts to a breach.

To make this showing, Plaintiffs plan to produce common, class-wide proof that Progressive's calculation of the PSA is not supported by proper statistical methodology and that its application is categorically invalid. This includes expert testimony that dealerships price to market, that their list price is reflective of cash market value, and that the PSA is "unjustified, arbitrary, capricious, and not reflective of the used car market." (Doc. 63 at 15). Indeed, Plaintiffs go further still, asserting that "[n]one of [their experts'] testimony is particular to a given vehicle: Plaintiffs' statistical experts will provide their analysis that the PSA is not supported by a proper statistical methodology or by the data, which the jury will find persuasive or not, but is not particular to specific vehicles." *Id.*

Therefore, determining whether the calculation and application of the PSA is valid or invalid hinges on the same evidence for an entire class, and the answer will be the same for all members of each one. As a result, it is a question common to each whole class.

### (ii)    Common Evidence of ACV

Second, Progressive alleges that even if Reynolds and Penn could overcome these individualized issues, it would still be necessary for the factfinder to determine whether any claimants received settlement payments that were, in fact, below their

vehicle's ACV. (Doc. 77 at 19). In Progressive's view, determining each vehicle's ACV would require an "individualized, fact-intensive, and adversarial process" for each individual claimant. *Id.* Muddying things further still, Progressive would also be entitled to rebut each putative class member's breach-of-contract claim with individualized evidence, showing either that (1) it paid ACV as measured by other appraisal methodologies, or (2) the invalid PSA did not result in an underpayment because other parts of the valuation *overvalued* the vehicle. *Id.* at 19-21.

To answer the former contention, Reynolds and Penn say they will proffer a method of calculating ACV that would apply uniformly to the whole class: "the very methodology used by Mitchell but without the PSA." (Doc. 64 at 15). Take out the PSA, Plaintiffs say, and Mitchell's vehicle valuations would be spot on. *Id.* at 17. Progressive could determine the ACV for any given class member, then, by consulting information on hand already: the Mitchell Report.

The factfinder, of course, would hardly be obliged to accept Plaintiffs' evidence or methodology, and it need not agree with the Plaintiffs' conclusion that the PSA-excised Mitchell Report would correctly determine ACV. The question is not whether the factfinder would be persuaded by Plaintiffs' case, but whether common issues predominate over individualized ones. And "[t]he fact that the jury might not be persuaded by Plaintiffs' common proof does not mean Plaintiffs lack common proof." *Volino*, 2023 WL 2532836, at *9. In Plaintiffs' case, "if the

factfinder accepts [their] evidence on the state of the market, then simply recalculating the valuation using Progressive's methodology without the PSA will accurately value each class member's vehicle." *Volino*, 2023 WL 2532836, at *8.

Nor does Progressive's rebuttal defeat predominance. In its defense, Progressive contends that it could disprove Plaintiffs' theory by presenting individualized evidence for each putative class member, which would show that under other appraisal measures, like KBB or NADA, it did, in fact, pay ACV. (Doc. 77 at 19-20). Progressive anchors this argument in part in the recent decision of *Sampson v. United Services Automobile Association.* 83 F.4th 414 (5th Cir. 2023); (Doc. 80).

In *Sampson*, the district court had certified a class of insureds who sought certification on a similar but distinguishable theory: According to the *Sampson* plaintiffs, the defendant insurance company breached its duty to determine ACV by relying on valuation reports that appraised their vehicles for less than they would have been valued under NADA. 83 F.4th 414. Under this theory, the plaintiffs claimed that NADA values—and NADA values alone—would be deemed "proof of actual cash value," notwithstanding two fatal oversights: first, NADA values would "not account for a vehicle's unique condition" like "damage to the vehicle," and second, "[t]he crux of Plaintiffs' theory [was] that any 'generally recognized used motor vehicle industry source' ... [would] provide[] conclusive evidence of a

vehicle's actual cash value, 'as a matter of law,'" but the theory pinned liability to NADA alone. *Id.* at 419–21. Vacating certification, the Fifth Circuit held that the ruling "[created] an explosion of predominance issues because [the defendant had] the due process right to argue, for each individual plaintiff, that damages should be determined by a different legally permissible method that would produce lower damages than NADA (or no damages at all)." *Id.* at 420.

*Sampson* is inapposite. Reynolds's and Penn's contention is not that ACV should be determined by NADA, KBB, or any other "generally recognized used motor vehicle industry source," *see id.*, but rather that it should be determined by "market value." Their theory does not yield the same "explosion of predominance issues," because market value, they say, can be determined simply and uniformly by excising the PSA deductions from the Mitchell Reports Progressive already uses—not, as in *Sampson*, by reference to some other industry appraisal standard. Far from an "arbitrary choice of a *liability* model," *id.* at 422, Plaintiffs' theory of liability depends on a model largely endorsed by Progressive already. "Progressive can hardly complain that the methodology [that Reynolds and Penn] would impose on them is the one Progressive chose and developed." *Volino*, 2023 WL 2532836, at *9.

What's more, "[t]he fact that a defense may arise and may affect different class members differently does not compel a finding that individual issues

predominate over common ones." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 544 (6th Cir. 2012). And in this case, "Progressive's defense that it indeed paid the ACV for the vehicles—at least as calculated by KBB and NADA—even with the PSA applied, is just that: a defense." *Brown*, 2023 WL 7219499, at *8.

Moving on, Progressive contends that it may have offset any putatively invalid PSA by *overvaluing* the vehicle elsewhere in its appraisal, as by inadvertently omitting key data about the condition of a vehicle. (Doc. 77 at 20–21). But this argument is equally unavailing. Overvaluations would not defeat predominance; they are simply errors that operate in the claimants' favor and are themselves amenable to class-wide resolution. *See Stuart v. State Farm Fire and Cas. Co.*, 910 F.3d 371, 376-77 (8th Cir. 2018); *see also Hicks v. State Farm Fire and Cas. Co*, 965 F.3d 452, 461 (6th Cir. 2020). Even if it were relevant, this theory rests wholly on speculation, which holds no truck with class certification. *See Volino*, 2023 WL 2532836, at *9.

Finally, in a notice of supplemental authority, Progressive urges the Court to ignore all other decisions finding class certification appropriate in materially identical cases and to instead follow the lead of the Southern District of Iowa. (Doc. 91). In *Kroeger v. Progressive Universal Ins. Co.*, the court broke with other courts and concluded that "individual issues predominate," and that "class wide treatment is not superior." No. 4:22-cv-00104-SHL-HCA, 2023 WL 9059523, at *8

(S.D. Iowa Nov. 20, 2023). In so holding, the *Kroeger* court relied chiefly on two Eighth Circuit cases: *Stuart v. State Farm Fire & Cas. Co.*, 910 F.3d 371 (8th Cir. 2018) and *In re State Farm Fire & Cas. Co. (LaBrier)*, 872 F.3d 567 (8th Cir. 2017).

*LaBrier* was brought on the theory that State Farm breached its homeowner's policy by deducting "labor depreciation" from the estimated replacement cost in its determination of ACV. *Labrier*, 872 F.3d at 571. The homeowner's policy did not define ACV or otherwise specify how it would be calculated, but the plaintiff claimed the labor-depreciation deduction to be illegal under Missouri law. *Id.* The district court agreed and concluded that common issues predominated, including the issue of whether State Farm's practice of deducting labor depreciation from ACV violated Missouri law. *Id.* at 572. But the Eighth Circuit disagreed, reversing on the merits. *Id.* at 573. Simply put, state law did *not* forbid depreciating labor costs, so there was no predominate issue left to justify certification. *Id.* at 573.

*Stuart*, in contrast, concerned a challenge to a homeowner's policy in which the policy *did* specify the method for calculating ACV.[2] 910 F.3d at 373-74. Arkansas law barred insurance companies from depreciating the cost of labor from ACV, which meant, in effect, that State Farm was required to calculate ACV one way, but did not. *Id.* at 376. In upholding certification, the court held that insurance

---

[2] In *Stuart*, Plaintiffs' contracts specified that the method for calculating ACV payments was "the amount it would cost to repair or replace damaged property, less depreciation." 910 F.3d 371, 376 (8th Cir. 2018).

company's obligation was "not merely to arrive at a 'reasonable' estimate of the property's value before and after the loss, but to calculate the ACV payment in accordance with the prescribed formula." *Stuart*, 910 F.3d at 376. Since "the parties agreed on a methodology and the only dispute [was] over including labor depreciation in the calculation, which is a discrete portion of the formula that is easily segregated and quantified," the court concluded that "[t]he potential need for individualized damages inquiries [was] not sufficient to overcome . . . predominance." *Id.*

Bound by these cases and the peculiarities of Iowa law, *Kroeger* concluded that the market-value analysis proved too complex for class certification to be appropriate absent a prescribed formula:

> Read together, [*Stuart* and *LaBrier*] do not allow the legal question to be framed in the manner proposed by Kroeger in a situation where there is no required formula for how to calculate "market value" in Progressive's policy or under Iowa law. Instead, because Iowa law recognize[d] that the determination of market value "necessarily involve[s] some degree of subjectivity," *Naumann*, 791 N.W.2d at 262, the question of breach must be evaluated on a policyholder-by-policyholder basis. If Progressive's approach in any given case results in a market value that is too low, that policyholder will have a remedy, but it is impossible to say from that one policyholder's situation whether Progressive also breached its contractual obligations as to every other policyholder.

*Kroeger*, 2023 WL 9059523, at *7.

But the *Kroeger* court itself noted that its decision was "at odds with district court decisions in other places on claims nearly identical to those" before it. *Id.* at

*8. The reason for its aberrational holding was clear: "none of [those] courts are in the Eighth Circuit," so not one was "bound by *LaBrier* and *Stuart*." *Id.*

But while *LaBrier* and *Stuart* compelled the *Kroeger* court to deny class certification for want of predominance, these same cases persuade the Court all the more that class issues do, in fact, predominate here. Like the State Farm policy at issue in *Stuart*, Progressive's Policy specifies the method for calculating ACV: "the market value, age, and condition of the vehicle at the time the loss occurs." (Doc. 63–3 at 19). And under Alabama law, courts "must enforce [an] insurance policy as written if [its] terms are unambiguous." *Safeway Ins. Co. v. Herrera*, 912 So. 2d 1140, 1143 (Ala. 2005). As in *Stuart*, Progressive was obliged not merely to determine a reasonable ACV, but to do so based on the market value of each total-loss vehicle. Alabama courts have defined "fair market value" as "the sum arrived at by fair negotiation between an owner willing to sell and a purchaser willing to buy, neither being under pressure to do so." *Gordon, Dana, Still, Knight & Gilmore, LLC v. Jefferson* County, 44 So. 3d 491, 496 (Ala. Civ. App. 2009). So if Reynolds and Penn are correct and Progressive discarded crucial market data in calculating ACV, then it would indeed have breached its contractual duty to base ACV calculations on market value for each class member.

As mentioned above, at least eight other district courts throughout the nation have held claims materially identical to those of Reynolds and Penn to satisfy the

predominance requirement for establishing a breach-of-contract claim. *See Chadwick*, 2024 WL 1156944, at \*1; *Schroeder*, 2024 WL 308330, at \*1; *Costello*, 2024 WL 239849, at \*1; *Curran*, 2023 WL 8715699, at \*1; *Clippinger*, 2023 WL 7213796, at \*1; *Drummond*, 2023 WL 5181596, at \*1; *Brown*, 2023 WL 7219499, at \*1; *and Volino*, 2023 WL 2532836, at \*1. The Court agrees with most courts to have considered these issues. Because Reynolds and Penn assert that the PSA's application necessarily breaches Progressive's Policy, and because they intend to submit evidence that excising the PSA from the Mitchell reports would result in ACV for the entire class, the Court concludes that their methodology can be used to make a class-wide liability determination.

### (iii)    Common Evidence of Damages

Individual damage calculations are generally insufficient to "defeat a finding that common issues predominate." *Brown v. Electrolux Home Prod., Inc.*, 817 F.3d 1225, 1239 (11th Cir. 2016). There are, however, two exceptions to this general rule. First, "individual damages defeat predominance if computing them will be so complex, fact-specific, and difficult that the burden on the court system [will] be simply intolerable." *Id.* at 1240. Second, "individual damages defeat predominance when they are accompanied by significant individualized questions going to liability." *Id.* Neither exception applies here.

First, as discussed earlier, the proposed damage calculations are not accompanied by significant individualized questions of liability. Plaintiffs intend to present common proof that the PSA is invalid under Progressive's policy and should not have been used in the total loss valuations. On top of this, they intend to present common proof of correctly calculated ACV—the Mitchell Report—to prove that class members were paid less than required under the policy because of the PSA's application. Therefore, because "the same evidence will suffice for each [class] member" to prove liability, common questions predominate. *Brown*, 817 F.3d at 1234 (11th Cir. 2016).

Nor is the formula that Reynolds and Penn offer for calculating damages fact-specific or difficult to apply. According to Plaintiffs, damages are a "ministerial calculation: the difference between the Market Value calculated in each Class Member's Mitchell Report with the PSA deductions and the actual market value amount, which is the Mitchell amount except without those deductions, plus applicable sales tax on that difference and prejudgment interest." (Doc. 63 at 17). In other words, Plaintiffs believe that simply recalculating the valuation using Progressive and Mitchell's methodology without the PSA will accurately value each vehicle.

Other courts have upheld class treatment where insureds have challenged a discrete component of their insurance company's ACV appraisal.[3] To take just one example, the Fifth Circuit in *Slade v. Progressive Sec. Ins. Co.* upheld class certification in a case much like this one. Like here, the plaintiffs claimed that Progressive underpaid on insurance claims for total loss vehicles; unlike here, however the plaintiffs challenged the WCTL itself, and they sought to replace it with another system—like NADA of KBB—on the theory that these would provide the appropriate base value from which Progressive could make further adjustments to calculate ACV. *Id.* at 411. In upholding certification, the court held that the "Plaintiffs' damages methodology did not preclude class certification." *Id.*

Here, Plaintiffs' proposed damage calculations are even *more* apt for class resolution than *Slade* because the methodology is simpler still: all Progressive need do is "excise the allegedly unlawful PSA." *Brown*, 2023 WL 7219499, at *9. Plaintiffs' proposed method of calculating damages thus relies on an already extant, mechanical formula, making class treatment appropriate. *See Sacred Heart Health Sys., Inc. v. Humana Mil. Healthcare Servs., Inc.*, 601 F.3d 1159, 1179 (11th Cir. 2010) (internal quotation marks omitted) (noting that issues of individualized damages are "least likely to defeat predominance where damages can be computed

---

[3] *See, e.g., Mitchell v. State Farm Fire & Cas. Co.*, 954 F.3d 700, 711-12 (5th Cir. 2020) (upholding a class certification where "a discrete portion of the [insurer's] formula . . . is easily segregated and quantified," so calculating damages would be feasible); *see also Slade v. Progressive Sec. Ins. Co.*, 856 F.3d 408, 411 (5th Cir. 2017).

according to some formula, statistical analysis, or other easy or essentially mechanical methods.").

Second, Plaintiffs' damage model here is consistent with their theory of liability. According to that theory, Progressive breached its contractual duty to determine ACV based on the market by applying an invalid PSA based on a skewed and artificial subset of the market. To remedy this, Plaintiffs contend that the PSA should simply be removed from Progressive's ACV calculation. And "[b]ecause Plaintiffs take the position that the PSA should not exist at all," their damages model, which is "based on simply removing the PSA and re-running the valuations," does indeed match their theory of liability. *Volino*, 2023 WL 2532836, at *10.

To sum up: Plaintiffs intend to present common evidence on two issues: (1) that the PSA is categorically invalid, and (2) that the Mitchell Report correctly calculates ACV. Their proposed damages model—simply removing the PSA from the Mitchell report—is consistent with their theory of liability and can be computed based on an already created mechanical formula, and the addition or subtraction of any plaintiffs to or from the class would not have a "substantial effect on the substance or quantity of evidence offered." *Brown*, 817 F.3d at 1235. Thus, the proposed class meets Rule 23(b)(3)'s predominance requirement.

## 2.     Superiority

Finally, the Court finds that a class action is superior to other available methods for fairly and efficiently adjudicating this controversy. FED. R. CIV. P. 23(b)(3). Four factors are "pertinent" to a finding of superiority:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

FED. R. CIV. P. 23(b)(3). All four factors weigh heavily in favor of superiority.

As to the first factor, the potential individual recovery for the putative class members is not large enough to warrant the burden or expense of litigating against a large insurance company.[4] *See Wolin v. Jaguar Land Rover N.A., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (holding that Rule 23(b)(3)(A) favors class certification when "recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis"). Progressive answers that many putative class members have an interest in "controlling their individual actions to pursue their most valuable claims" or taking advantage of informal negotiation and dispute resolution to settle ACV concerns, (Doc. 77 at 28), but this argument is unconvincing. As discussed

---

[4] Plaintiff Reynolds's PSA damages are $714.59 and Plaintiff Penn's PSA damages are $847.00. (Doc. 63-7 at 57).

above, any class members who wish to dispute other aspects of Progressive's methodology can opt out of the class.

The second and third factors likewise tilt the scales toward certification. Neither party has cited any case in Alabama to concern the same or similar claims, nor have they argued for an alternative, more desirable forum for litigating the claims than the current one.

Finally, the proposed class is manageable. Suggesting otherwise, Progressive contends that the only way to identify the key issues that the Plaintiffs have raised would be to review each class member's unique claim file; and by its calculations, collecting the claims for nearly 35,000 class members—never mind reviewing them—would take a single full-time employee about six years. (Doc. 77 at 29). A still greater hurdle, says Progressive, is that it would not be able to identify all members of the class solely by looking at the data in its claim systems and Mitchell Reports, thus concluding that "[a] class action process that would require years of record collection alone is not a superior method of resolving disputes." *Id.* at 29.

But Progressive's own evidence belies the task's unmanageability. According to Progressive's own Claims Process Director, Stephen Hover, "Progressive maintains data reflecting certain information from the last-in-time WCTL valuation report for a given total-loss claim. The data includes the type of report (*e.g.*, comparable vehicle valuation report, dealer quote report), the base value, condition

adjustments, pre-tax adjustment, and market value, among other things." (Doc. 77-29 at 2). It would appear, then, that the data Progressive would need to evaluate the claims is readily at hand, and an employee could identify the class members by consulting this data alone.

Besides, manageability is a comparative analysis. *Cherry v. Domestic Corp.*, 986 F.3d 1296, 1304-05 (11th Cir. 2021). And here, class treatment is without a doubt more manageable than a diffusion of individual cases on the same claims for even a small subset of the myriads of class members. Progressive has failed to identify "any specific management problems—aside from the obvious ones that are intrinsic in large class actions—that would render a class action impracticable in this case." *Klay v. Humana, Inc.*, 382 F.3d 1241, 1273 (11th Cir. 2004)

All four factors of the superiority analysis weigh in favor of class certification. FED. R. CIV. P. 23(b)(3). The Court therefore finds that class treatment in this case is superior, and Rule 23(b)(3) is satisfied.

## IV.  CONCLUSION

For the foregoing reasons, the Court **GRANTS** Plaintiffs' Motion to Certify Class (Doc. 64).

**DONE** and **ORDERED** this April 3, 2024.

**LILES C. BURKE**
UNITED STATES DISTRICT JUDGE